**INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL-CIO; United Automobile Aircraft and Agricultural Implement Workers of America; and United Papermakers and Paperworkers, Petitioners,**

v.

**UNITED STATES of America and Atomic Energy Commission, Respondents,**

**Power Reactor Development Company, State of Michigan, Intervenors.**

No. 15271.

United States Court of Appeals District of Columbia Circuit.

Argued March 23, 1960.

Decided June 10, 1960.

Petitions for Rehearing en Banc Denied July 25, 1960.

Mr. Benjamin C. Sigal, Washington, D. C., for petitioners.

Mr. Lionel Kestenbaum, Attorney, Atomic Energy Commission, with whom Asst. Atty. Gen. George C. Doub, Messrs. Loren K. Olson, General Counsel, Atomic Energy Commission, Courts Oulahan, Sp. Asst. to the General Counsel, Atomic Energy Commission, and Samuel D. Slade, Attorney, Department of Justice, were on the brief, for respondents.

Mr. W. Graham Claytor, Jr., Washington, D. C., with whom Mr. John Lord O'Brian, Washington, D. C., was on the brief, for intervenor Power Reactor Development Company.

Mr. Jerome Maslowski, Lansing, Mich., entered an appearance for intervenor State of Michigan.

Before EDGERTON, BAZELON, and BURGER, Circuit Judges.

EDGERTON, Circuit Judge.

Petitioners seek review of the Atomic Energy Commission's Order of May 26, 1959 which continued in effect, with amendments, a "provisional" construction permit issued August 4, 1956, for a nuclear power reactor. Section 104(b) of the Atomic Energy Act of 1954 authorizes the Commission to issue licenses for "utilization and production facilities involved in the conduct of research and development activities leading to the demonstration of the practical value of such facilities for industrial or commercial purposes. In issuing licenses under this subsection, the Commission shall impose the minimum amount of such regulations and terms of license as will permit the Commission to fulfill its obligations under this Act to promote the common defense and security and to protect the health and safety of the public * * *." 68 Stat. 937, 42 U.S.C.A. § 2134(b).

The holder of the construction permit, intervenor here, is the Power Reactor Development Company (PRDC), a Michigan membership corporation organized "to study, develop, design, fabricate, construct and operate one or more experimental nuclear power reactors * * * to the end that there may be an early demonstration of the practical and economical use of nuclear energy for the generation of electrical energy * * *." Of PRDC's 21 members, 14 are public utilities and 7 are equipment manufacturers.

The reactor will be the largest, but not the first, "fast breeder" reactor in the United States. The site is at Lagoona Beach, Monroe County, Michigan, on the shore of Lake Erie, 30 miles southwest of Detroit.

*Petitioners' Standing*

We cannot review the Commission's order at petitioners' request unless (1) it is a "final order" and (2) petitioners are "aggrieved" by it. Atomic Energy Act of 1954, § 189, 42 U.S.C.A. § 2239(b); 5 U.S.C.A. §§ 1032, 1034. Although the Commission's action of May 26, 1959 was entitled "Commission's Opinion, Final Decision and Order," the Commission and PRDC now contend that the order was not final. They also contend that it did not aggrieve the petitioners. In our opinion it was what it purported to be, a final order, and petitioners are "aggrieved" by it. Because it threatens them with economic injury, they "had the requisite standing to appeal and to raise * * * any relevant question of law in respect of the order * * *." Federal Communications Commission v. Sanders Brothers Radio Station, 309 U.S. 470, 477, 60 S.Ct. 693, 698, 84 L.Ed. 1037.

Petitioners are national or international labor unions which intervened, with some of their members, in the proceedings before the Commission, on the basis that "granting the conditional construction permit herein (1) is a violation

of the provisions of the Atomic Energy Act of 1954, and the regulations pursuant thereto adopted by the Commission * * * and (2) will result in the construction of a reactor which, under present technological conditions, is inherently unsafe, and which will thereby create a hazard which will place the individual Intervenors, the members of the UAW and their families, and the UAW in danger of an explosion or other incident" damaging to the individuals and their homes, real estate values, and employment; that the value of collective bargaining contracts "will be seriously impaired if the PRDC reactor is built in this area without reasonable assurances of safety"; and that there are "reasonable grounds for relief that a license to operate said facility when it is completed, with an expenditure of $45,000,000 will be issued without proper consideration of and regard for the health and safety of the public."

In their reply brief in this court, petitioners contend that "The fear of a possible atomic catastrophe, in itself, before any operation would begin, would, among other things have the effect of depressing values of property owned by the Petitioners, and would cause plants in which they work under collective bargaining agreements to move and thereby cause a loss of employment." Their reply brief asserts that "the uncontroverted allegations of their petition for intervention before the Commission set forth the economic injury they would suffer merely from the construction of the reactor itself." But we find no such allegations in their petition for intervention before the Commission. The theory of that petition was that construction would cause operation, and operation would cause injury, not that construction without operation would cause injury.[1] Judicial review is limited to the record before the Commission. 5 U.S.C.A. § 1037 (a).

As the Commission says in its order, "a construction permit is a step toward a license rather than the equivalent thereof. * * * This permit is provisional to the extent that a license authorizing operation of the facility will not be issued by the Commission unless PRDC has submitted to the Commission (by proposed amendment to the Application) the complete, final Hazards Summary Report (portions of which may be submitted and evaluated from time to time), and the Commission has found that the final design provides reasonable assurance that the health and safety of the public will not be endangered by operation of the facility in accordance with the specified procedures. It is further provisional to the extent that the Commission reserves jurisdiction, at any time prior to issuance of an operating license, upon notice to the parties herein, to reopen this proceeding for the purpose of receiving additional evidence, and to make such determinations and take such action with respect to the continuance, vacation, or modification of this permit as the entire record warrants." But the order also says: "There is reasonable assurance that theoretical and experimental programs under way will develop sufficient data to justify the issuance of an operating license, and that the results of these programs will be available prior to the time it is necessary for the Commission to rule on the operating aspect of the PRDC license Application." PRDC says "it must be taken as settled * * * that the further technical information needed to complete the PRDC application for license will be supplied." Although this positive prediction overstates the matter, it is plainly probable, in a high degree, that if the construction permit stands PRDC will get an operating license and will operate. We think petitioners are therefore aggrieved by the issuance of the permit.

*Safety findings required by the Atomic Energy Act*

■ Petitioners contend that "The Act and the regulations of the Commis-

---

1. It is undisputed that construction without operation will cause no *physical* injury or danger not involved in the erection of any large building.

sion * * * require, as conditions precedent to the issuance of every construction permit for an atomic energy power reactor, that *as of the time the construction permit is issued* the Commission find that (1) it has reasonable assurance that the reactor may be constructed *and operated* at the proposed site without undue risk to the health and safety of the public * * *."

It is undisputed that the Commission must make such a finding when it authorizes operation. The question is whether it must make such a finding when it authorizes construction. In our opinion it must.

Section 182 of the Atomic Energy Act of 1954, which is headed "License applications", provides in paragraph (a): " * * * In connection with applications for licenses to operate production or utilization facilities, the applicant shall state such technical specifications, including * * * the place of the use * * * and such other information as the Commission may, by rule or regulation, deem necessary in order to enable it to find that the utilization or production of special nuclear material * * * will provide adequate protection to the health and safety of the public. Such technical specifications shall be a part of any license issued. * * *" 42 U.S.C.A. § 2232(a).

It seems to be unquestioned that the phrase used in § 182, "adequate protection to the health and safety of the public", and the Commission's phrase, "without undue risk to the health and safety of the public", are substantially equivalent.

Section 185 of the Act, which is headed "Construction permits", provides: "All applicants for licenses to construct or modify production or utilization facilities shall, if the application is otherwise acceptable to the Commission, be initially granted a construction permit. * * * Upon the completion of the construction or modification of the facility, upon the filing of any additional information needed to bring the original application up to date, and upon finding that the facility authorized has been constructed and will operate in conformity with the application as amended and in conformity with the provisions of this chapter and of the rules and regulations of the Commission, and in the absence of any good cause being shown to the Commission why the granting of a license would not be in accordance with the provisions of this Act, the Commission shall thereupon issue a license to the applicant. For all other purposes of this Act, a construction permit is deemed to be a 'license'." 42 U.S.C.A. § 2235.

While the bill was pending, Senator Humphrey proposed, and withdrew, an amendment which would have added after the word "license", at the end of § 185: " , and no construction permit shall be issued by the Commission until after the completion of the procedures established by Section 182 for the consideration of applications for licenses under this act." (100 Cong.Rec. 11566 (1954); Legislative History of the Atomic Energy Act of 1954, Vol. III, p. 3759; Vol. I, p. 733) He said: *"The purpose of the amendment* when it was prepared *was to make sure that the construction of a facility was not permitted prior to the authorization of a license,* because had that been done what it would have amounted to would be getting an investment of a substantial amount of capital, which surely would have been prejudicial in terms of the Commission issuing the license. In other words, if the Commission had granted the construction permit for some form of nuclear reactor, and then the question of a license was not fully resolved, surely there would have been considerable pressure, and justifiably so, for the Commission to have authorized the license once it had authorized the permit for construction.

"The chairman of the committee tells me he has modified certain sections by the committee amendments to the bill, of which at that time I was not aware. *The chairman indicates to me that under the terms of the bill, as amended, the construction permit is equivalent to a*

*license.* In other words, as I understand, under the bill a construction permit cannot be interpreted in any other way than being equal to or a part of the licensing procedure. Is that correct?" Senator Hickenlooper, the manager of the bill, replied: "The Senator is correct. The staff has worked on this matter. * * * A license and a construction permit are equivalent. * * * Therefore, we believe, and we assure the Senator, that *the amendment is not essential to the problem which he is attempting to reach."* After some discussion of other sections of the bill, this colloquy occurred: "Mr. Humphrey. In other words, the revised sections on judicial review and on hearings and *the revised section 182 on license application all apply directly to construction permits?* Mr. Hickenlooper. *Yes.* Mr. Humphrey. *With that statement, Mr. President, I withdraw my amendment. The only purpose of the amendment was to clarify that section.* I am grateful to the chairman for having done it before the amendment was considered." (Emphasis added.) (100 Cong.Rec. 11566; Legislative History, Vol. III, p. 3759.)[2]

If, as this indicates, § 182 applies "directly to" construction permits, when the Commission issues a construction permit it must "find that the utilization or production of special nuclear material * * * will provide adequate protection to the health and safety of the public"; or, in the Commission's phrase, that the facility can be "operated at the location proposed without undue risk to the health and safety of the public."

The Joint Committee on Atomic Energy said in its report on the bill: "Section 185 permits the Commission to issue construction permits to applicants for a production or utilization facility, describes the terms of the construction permit, and requires the issuance of a license if the construction is carried out in accordance with the terms of the construction permit." (S.Rep.No. 1699, 83d

Cong., 2d Sess., 28 (1954); Legislative History, Vol. I, p. 776.) It seems certain that if the Act did not require, as a condition to the issuance of a construction permit, a finding that the proposed facility can be operated without undue risk to the health and safety of the public, the Act would not require the issuance of a license when the permitted construction is carried out.

At the very least it is doubtful whether the Commission's construction of the Atomic Energy Act is correct. The possibilities of harm are so enormous that any doubt as to what findings the Act requires, and any doubt as to whether the Commission made such findings, should be resolved on the side of safety.

### The Commission's Safety Findings

In our opinion the Commission's findings regarding safety of operation are not sufficient.

■ An Initial Decision dated December 10, 1958, contains this unqualified finding: "22. The Commission finds reasonable assurance in the record that a utilization facility of the general type proposed in the PRDC application and amendments thereto can be constructed and will be able to be operated at the location proposed without undue risk to the health and safety of the public." But in the Opinion and Final Decision which accompanied its order of May 26, 1959, by interpolating the phrase we emphasize, the Commission qualified the finding: "22. The Commission finds reasonable assurance in the record, *for the purposes of this provisional construction permit,* that a utilization facility of the general type proposed in the PRDC Application and amendments thereto can be *constructed and operated at the location* without undue risk to the health and safety of the public." (Emphasis added.) This is not a finding that a facility can be operated there without undue risk. It is a finding that there is sufficient likelihood that a facility can be

---

2. The Commission apparently interprets this colloquy as concerning only the "procedural safeguards" of notice, hearings, and appeal. We cannot so understand it and cannot suppose the Senate so understood it.

operated there without undue risk so that, in the Commission's opinion, it is appropriate to issue a "provisional" construction permit. In our opinion such a finding does not meet the requirements of the Act.

The Commission made other statements which confirm the impression that it no longer found, as it had found in December, reasonable assurance that a facility can be operated at the location without undue risk. The Commission said: "The degree of 'reasonable assurance' with respect to safety that satisfies us in this case for purposes of the *provisional* construction permit would not be the same as we would require in considering the issuance of the *operating* license. * * * It has not been positively established that a fast breeder reactor of the general type and power level proposed by Applicant can be *operated* without a credible possibility of releasing significant quantities of fission products to the environment * * *." (Emphasis in original.) And again: "*For the purposes of a provisional construction permit*, there is reasonable assurance that a reactor of the general type described in the Application can be so designed that no credible accident in the course of its operation is likely to result in the release of significant quantities of fission products into the atmosphere." (Emphasis added.)

The Commission expressed confidence that future scientific developments would enable it, in the future, to find that the reactor could be operated without undue risk. It said: "There is reasonable assurance that theoretical and experimental programs under way will develop sufficient data to justify the issuance of an operating license, and that the results of these programs will be available prior to the time it is necessary for the Commission to rule on the operating aspect of the PRDC license Application." "There is reasonable assurance that theoretical and experimental investigations which have been undertaken, together with operating experience on one or more of the EBR–I, EBR–II and Doun-

reay reactors, will establish definitively, prior to the scheduled completion date of the PRDC reactor, whether or not the reactor proposed by Applicant can be so operated"; *i. e.*, whether it can be "operated without a credible possibility of releasing significant quantities of fission products to the environment." Again, "there is reasonable assurance that *evidence will establish* that the reactor proposed by Applicant can be so operated." (Emphasis added.) This clearly implies that *evidence does not now establish* that the reactor can be so operated. The Commission's predictions regarding the future course of scientific development do not in our opinion satisfy the requirement of the Act.

The Commission said: "It is in the nature of reactor design, although certainly not unique to it, that many features remain to be designed and demonstrated after construction is begun—and indeed some features redesigned and replaced after operation is under way. * * * By proceeding with construction and further research and development simultaneously, rather than awaiting complete research and development results Applicant will save several years in the time required to place in operation its demonstration power reactor." As a matter of policy, there is force in these considerations. But Congress seems to have been more impressed by the opposite policy considerations to which Senator Humphrey, in his colloquy with Senator Hickenlooper, called the attention of the Senate. The economy cannot afford to invest enormous sums in the construction of an atomic reactor that will not be operated. If enormous sums are invested without assurance that the reactor can be operated with reasonable safety, pressure to permit operation without adequate assurance will be great and may be irresistible. PRDC's estimate of the cost of construction, preconstruction research and development, and administrative expenses during construction and test operation was $44,-020,000. The Commission found there would probably be "a cost over-run".

In contrast with the Commission's repeated expressions of uncertainty, it used other expressions which might seem to indicate a positive opinion regarding safety of operation. The Opinion and Final Decision, before adverting to the issue of safety and other issues, said broadly: "we amplify and affirm our Opinion and Initial Decision dated December 10, 1958." The Commission also said: "The principal factual issue in this proceeding is whether there is information sufficient to provide a reasonable assurance that a utilization facility of the general type proposed in the PRDC application can be constructed and operated at the location proposed therein without undue risk to the health and safety of the public. Subsidiary to this issue is whether there is reasonable assurance that technical information omitted from, and required to complete, the application will be supplied before issuance of an operating license. A careful evaluation of the entire record in this proceeding can only lead to an affirmative answer to all of these questions." And again: "It is enough for the purposes of the present proceeding (that is, for the issuance of a provisional construction permit), and for the satisfaction of the requirements of the statute and the regulations, that there be reasonable assurance that the reactor can be constructed and operated without undue risk to the health and safety of the public. We conclude that the present state of knowledge as described in the record gives, and the accident possibilities presented on the record do not negate, that assurance."

It results that the Commission's findings regarding safety of operation are ambiguous. In view of the nature, size, and location of the project, we think the findings should be uncommonly free from ambiguity. The Commission should "make the basis of its action reasonably clear. We cannot find that it did so here." Radio Station KFH Co. v. Federal Communications Commission, 101 U.S.App.D.C. 164, 166, 247 F.2d 570, 572. "'We must know what a decision means before the duty becomes ours to say whether it is right or wrong.'" Secretary of Agriculture v. United States, 347 U.S. 645, 654, 74 S.Ct. 826, 832, 98 L.Ed. 1015. Pacific Far East Line, Inc. v. Federal Maritime Board, 107 U.S.App.D.C. 155, 275 F.2d 184, 187.

We think the Commission's safety findings are deficient in an additional respect.

In 1957 the Commission made to the Joint Committee on Atomic Energy "a report of a study of the possible consequences in terms of injury to persons and damage to property, if certain hypothetical major accidents should occur in a typical large nuclear power reactor." All the experts agreed "that the chances that major accidents might occur are exceedingly small." But "Under adverse combinations of the conditions considered, it was estimated that people could be killed at distances up to fifteen miles, and injured at distances of about forty-five miles. Land contamination could extend for greater distances." Undisputed testimony before the Commission shows that there is a "possibility of a major disaster, even though it has a low probability".

As the Commission said, "the question of safety obviously cannot be considered without regard to proposed location." The Commission found: "The site is bordered on one side by water and provides an exclusion area on the land side with a minimum radius of 2900 feet. The population distribution for given distances from the site is as follows: 1 mile, population 175; 2, 600; 5, 1,800; 10, 31,300; 20, 187,100; 30, 2,001,700. During the summer months the population within five miles would be increased due to vacationing transients and to the fact that beaches two to five miles southwest of the site may be crowded with thousands of people."

We think it clear from the Congressional concern for safety that Congress intended no reactor should, without compelling reasons, be located where it will expose so large a population to the pos-

sibility of a nuclear disaster. It does not appear that the Commission found compelling reasons or saw that such reasons were necessary. It said: "The evidence of record with respect to site gives reasonable assurance that the site is satisfactory from structural and underground water flow standpoints. The meteorology of the site is complex, but no reason appears in the record for it to be disqualifying. The site makes possible extensive safeguards against the inadvertent release of liquid contaminants. * * * Studies of weather, hydrology, geology, and similar problems have yielded considerable information and are still in progress. Although the data of these types are not yet complete or conclusive, the record gives reasonable assurance that safe operation of the reactor will be as likely in that location as in any other location." [3] We think this finding clearly insufficient. We need not consider whether even the most compelling reasons for preferring this location could support a finding that the reactor could be operated at this location without "undue" risk, or with "adequate" protection, to the health and safety of the public.

Because we think the safety findings insufficient, we must set aside the Commission's grant of a construction permit and remand the case for such further proceedings consistent with this opinion as the Commission may determine. We need not consider other points raised by the petitioners.

BURGER, Circuit Judge (dissenting).

I dissent because I think there is no occasion at this time for the court to reach the issue of the ultimate safety of the plant's operations. The Commission has issued only a provisional permit to build a plant, not to operate it. The plant cannot go into operation until and unless the intervenor PRDC meets the safety provisions of the Act.

The sole basis of challenge to the provisional construction permit is that the *future possibility* that an operating permit will be unlawfully and improperly issued by the Commission creates a "present," "immediate" and "unavoidable threat" of injury. I do not think we have any occasion to consider what is not now before us. The Commission expressly deferred action on that issue. This does not appear to me a "final order" which gives us jurisdiction to pass on the ultimate issue of safety; nor does it empower us to tell the Commission that it must pass on the ultimate safety of the operation before the plant is constructed. Orders are not final as to a person "unless and until they impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process." Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 1948, 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568.

In an area involving as much scientific uncertainty as development of nuclear energy for peaceful purposes, the Commission must be permitted to proceed step by step, *i. e.*, make its preliminary finding of probable safety when the construction permit issues and reserve final approval of operations until a later date.

I respectfully suggest that my colleagues are undertaking to assume responsibilities which Congress vested in the Commission. This is illustrated in the majority's statement

"No reactor should, without compelling reasons, be located where it will expose so large a population

3. The Commission continued: "We anticipate that knowledge to be acquired will fortify that assurance. * * * It is possible that there may be presently unknown effects in large fast reactor systems. A prototype of the proposed reactor at a remote location has been urged as affording greater assurance against the possibility of such unknown effects than does the presently planned experimental and theoretical programs. (sic) The Commission finds that the necessity, however, for constructing such a prototype has not been shown. If the program of meltdown investigation should prove inconclusive, it will be necessary to reconsider the question of need for a prototype."

to the possibility of a nuclear disaster."

On what evidence does the majority make a finding of "nuclear disaster" directly opposed to the finding which the Atomic Energy Commission made? The majority is, in effect, telling the Atomic Energy Commission that it has made an *unwise* decision on the location of the plant.

The majority also goes beyond the established limits of judicial review when it states:

"The economy cannot afford to invest enormous sums in the construction of an atomic reactor that will not be operated. If enormous sums are invested without assurance that the reactor can be operated with reasonable safety, pressure to permit operation without adequate assurance will be great and may be irresistible."

From an erroneous premise drawn out of thin air, the majority proceeds to draw an unwarranted conclusion. On what evidence can we as judges say our "economy cannot afford," or even that these appellees cannot afford, this large investment for peaceful uses of nuclear energy? I suggest our entire history is to the contrary. We invested not mere millions but *billions* in the original development of nuclear fission on a totally unproven theory of physics. It was an act of faith in the views of scientists. Surely it cannot be seriously suggested that these giants of American industry which formed PRDC are not well able—and willing—to risk the loss of millions in experiments and research. Forty or fifty million dollars to the sponsors of PRDC is a small investment to risk for the world's first known experiment of this kind into peaceful uses of nuclear energy.

If we were dealing with a radio or TV license or some other purely commercial enterprise in a developed and mature industry I would agree that there is a risk that large investment in machines might conceivably exert a subtle influence on the ultimate grant of an operations permit. Cf. Community Broadcasting Co. v. Federal Communications Commission, 107 U.S.App.D.C. 95, 274 F.2d 753. But I cannot join in the suggestion that members of the Atomic Energy Commission who have assumed obligations under oaths as binding as ours would permit an operation dangerous to the public because 40 or 50 million dollars is invested in brick, mortar and steel by men who knew from the outset they were engaged in a scientific gamble. And if any administrative agency should so abdicate its responsibilities in a matter as grave as this—which I cannot believe is likely—the courts are always in a position to exercise a final and stringent scrutiny on the issue of public safety.

Development in an area like this must, of necessity, proceed step by step. The Commission has found that the issuance of the construction permit on a provisional and restricted basis "does not in any manner adversely affect the health and safety of the public or that of the [petitioners]." The appellants do not attack this finding.

At this stage how can anyone know what the result will be? This court considered a challenge not unlike that of appellants' challenge in Associated-Banning Co. v. United States, 1957, 101 U.S.App.D.C. 151, 247 F.2d 557, 561: "We cannot assume that the Board will not conduct its hearing within the intendment of the Act, so far as it may apply. It may well be, for all we are shown, that the Board's ultimate action will completely dispel every prospective fear voiced by the protest and the complaint. It is clear that the Board has not as yet entered an order 'final' as to these petitioners."

The essence of the majority action is found in its acceptance of the idea that once the Commission has permitted PRDC to invest its millions in the plant they are "bound" or "likely" to relax their notion of what is safe or dangerous in order to bail out the investors.

654

I emphasize that I cannot for a moment believe the sponsors of PRDC are so naive that they would think their investment of these millions is not speculative just as is most research. Nor can I believe they think that any amount of invested capital will persuade the Atomic Energy Commission to make a finding of safety which is not supported by substantial scientific evidence. It is entirely possible that PRDC might find itself the owner of a 50 million dollar scientific "white elephant" if, after completion of construction, it cannot satisfy the safety standards of the statute. Should that be the case it will be simply one of the unproductive steps in what promises to be a program to open to mankind sources of power undreamed of only a few years ago.