274 F.2d 753
 107 U.S.App.D.C. 95
 COMMUNITY BROADCASTING CO., Inc., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, Modern
Broadcasting Company of Baton Rouge, Inc., Intervenor.
COMMUNITY BROADCASTING CO., Inc., Petitioner,
v.
UNITED STATES of America, Federal Communications Commission,
Respondents, Modern Broadcasting Company of Baton
Rouge, Inc., Intervenor.
 Nos. 15313, 15314.
 United States Court of Appeals District of Columbia Circuit.
 Argued Oct. 21, 1959.
Decided Feb. 8, 1960.
 
 Mr. Frank U. Fletcher, Washington, D.C., with whom Messrs. Robert L. Heald and Russell Rowell, Washington, D.C., were on the brief, for appellant in No. 15313 and petitioner in No. 15314.
 Mr. Max D. Paglin, Asst. Gen. Counsel, Federal Communications Commission, with whom Messrs. John L. Fitz-Gerald, Gen. Counsel, and John H. Conlin, Counsel, Federal Communications Commission, were on the brief, for appellee in No. 15313 and respondent, Federal Communications Commission in No. 15314.
 Mr. Richard A. Solomon, Atty., Department of Justice, was on the brief for respondent United States of America in No. 15314.
 Mr. Richard M. Zwolinski, Counsel, Federal Communications Commission, also entered an appearance for appellee in No. 15313 and respondent Federal Communications Commission in No. 15314.
 Mr. Harold D. Cohen, Washington, D.C., with whom Messrs. Vernon C. Kohlhass and William S. Green, Washington, D.C., were on the brief, for intervenor. Mr. Thomas N. Dowd, Washington, D.C., also entered an appearance for intervenor.
 Messrs. James A. McKenna, Jr., and Vernon L. Wilkinson, Washington, D.C., filed a brief on behalf of American Broadcasting-Paramount Theatres, Inc., as amicus curiae, in both cases urging dismissal.
 Before WILBUR K. MILLER, DANAHER and BURGER, Circuit Judges.
 BURGER, Circuit Judge.
 
 
 1
 Appellant challenges the action of the Federal Communications Commission which granted to Modern Broadcasting Company (intervenor) a Special Temporary Authority (hereafter S.T.A.) to construct and operate a TV station on Channel 9, V.H.F., at Baton Rouge, Louisiana. Modern has been operating station WAFB-TV in Baton Rouge, Louisiana, on U.H.F., Channel 28, since 1953, and has been sustaining operating losses since 1956. Channel 9, V.H.F., had been shifted, on June 3, 1959, by a rule making proceeding not challenged here, from Hattiesburg, Mississippi, to Baton Rouge.[1]
 
 
 2
 On June 15, 1959, Modern applied for a construction permit for Channel 9 at Baton Rouge and, on June 18, filed a request for Special Temporary Authorization to permit immediate use of the channel without awaiting a comparative hearing. Modern asserted that it could not in any event continue its operations on the U.H.F. Channel 28 beyond 1959 in view of the financial losses being sustained. Modern's application asserted also that it would be 'willing to conduct such temporary operation under the express condition that it will expire automatically upon the commencement of any regular operation on Channel 9' resulting from the Commission's final action on the grant. Modern also agreed that 'no effect whatsoever shall be given to any expenditure of funds * * * and that no preference shall be accorded to (Modern) by virtue of the (temporary) grant * * *.'
 
 
 3
 Community Broadcasting Co., Inc., petitioner here, filed objection to the request for temporary authority, saying it would file its application for Channel 9 along with a request for a S.T.A. pending final action on the application. On July 21, 1959, Community filed an application for a construction permit but filed no request for temporary authority to operate pending final action.
 
 
 4
 The two applications being mutually exclusive, a comparative hearing for a license for regular operations became imperative. Modern renewed its request for temporary authority and Community again objected repeating its assertion that it would file a request for the S.T.A. and that any action by the Commission at that time on the question of interim operating authority would be premature because it could not be known how many applicants might ultimately seek comparative consideration for the channel.
 
 
 5
 On July 22, 1959, one day after Community's construction permit application was filed, the Commission granted Modern's application for the S.T.A. pending the conclusion of a comparative hearing on the competing applications for permanent operations,[2] theirs being the only request for temporary authority then before the Commission. It predicated its action on the fact that the Baton Rouge reallocation problem had been under formal consideration since October 1957; that due to the probability of a long comparative hearing regular authorization could not be issued with respect to Channel 9 for several years; and that the public need for an additional V.H.F. channel at Baton Rouge, which need had led to the reassignment of chnnels, could be met promptly only by the grant of special temporary authorization.
 
 
 6
 Community filed a petition for reconsideration and a motion for a stay of the S.T.A. grant to Modern; the Commission denied Community's stay request on July 29, 1959.[3] Community then withdrew its petition for reconsideration and sought review here of the Commission's action granting the S.T.A. to Modern.
 
 
 7
 Appellant urges numerous grounds for reversal. The Commission urges, among other things, that many of these points were never raised to the Commission below, and hence may not be raised now. N.L.R.B. v. Cheney California Lumber Co., 1946, 327 U.S. 385, 66 S.Ct. 553, 90 L.Ed. 739. The Commission nevertheless seems to suggest that this court has before it a 'public notice' granting Modern its temporary authority, and its explanatory letter to appellant concerning the grant. We therefore limit our review to the original Modern application, and appellant's objection.[4]
 
 
 8
 Modern's application rests on the fact that if a comparative hearing be necessary, V.H.F. service on Channel 9 for Baton Rouge would be delayed for several years; that its U.H.F. station was sustaining losses and would be forced to cease operations if the grant were not forthcoming at once; that in this event there would be no competitive television service in Baton Rouge; that the public interest would be better served by beginning V.H.F. competitive service in accord with the basic purpose of the Commission's order re-allocating the channel; and that certain possible overlap problems were not sufficiently grave as to preclude the temporary grant.
 
 
 9
 Appellant, in its opposition, contended that it intended to request the S.T.A. for the channel; that it was as qualified as Modern to receive such authority; that the reasons advanced by Modern were insufficient to sustain the grant; and that the overlap problem was significant. The Commission nevertheless granted Modern's request.
 
 
 10
 We think that the issues raised in the Commission, together with its action in granting the S.T.A. for an indeterminate period while multiple applications for construction permits for regular operations are pending gives each applicant standing in this court and affords a basis for review as to whether the Commission's action has a sufficient basis to support it.
 
 
 11
 The problem of temporary authorizations gained significance after the ruling in Ashbacker Radio Corp. v. Federal Communications Comm'n, 1945, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108. The Supreme Court there held that where two mutually exclusive applications are made for the same frequency, the Commission cannot grant one application for regular operations pending the holding of a comparative hearing since the subsequent hearing would then be 'an empty thing.' Id., 326 U.S. at page 330, 66 S.Ct. at page 150.
 
 
 12
 A practical problem immediately presented itself. Comparative hearings are lengthy and detailed affairs, frequently taking years before final conclusion. Occasionally the need for continuing already operating services, or establishing new ones, was so great as to render it against the public interest to withhold authorization pending final outcome of the necessary hearings. See American Broadcasting Co. v. Federal Communications Comm'n, 1951, 89 U.S.App.D.C. 298, 191 F.2d 492; Peoples Broadcasting Co. v. United States, 1953, 93 U.S.App.D.C. 78, 209 F.2d 286. The Supreme Court implicitly recognized the dilemma for it carefully pointed out in Ashbacker that the Commission there did not conditionally grant the application, an inference at least that such a conditional grant pending hearing was proper in some circumstances. 326 U.S. at page 331, 66 S.Ct. at page 150.
 
 
 13
 Thereafter, the Commission evolved a policy of granting such temporary authority in certain circumstances. We have upheld such temporary grants, given without a comparative hearing, against contentions that such procedure violates the Ashbacker rule. Peoples Broadcasting Co. v. United States, supra. Such grants are a 'practical solution of a problem which involved the public interest in the continuity and quality of television service.' Id., 93 U.S.App.D.C. at page 80, 209 F.2d at page 288.
 
 
 14
 Nevertheless, the existence of a power to grant temporary operating authority does not necessarily mean that it is to be granted in all circumstances simply because there is to be a long delay in completing the comparative hearings. The grant of temporary authority to one of several competing applicants before there has been any hearing is pregnant with danger to truly comparative consideration. The temporary grantee must take all the steps and make substantially all of the investment he would make if granted a construction permit for regular operations. Intervenor here estimates its probable investment under the temporary authority as in excess of one quarter million dollars. Appellant and the Commission suggest the investment may be larger. In the 2 1/2 years, or more, before the comparative hearing can be completed, intervenor will accumulate the great advantage of demonstrated past performance as against the promised future performance of the competing applicant.
 
 
 15
 Undoubtedly, the public interest may in some circumstances overbalance the possible disadvantages which flow from temporary operations, as for example, where a community has no existing service, or stands to lose its only service. See Peoples Broadcasting Co. v. United States, supra. Yet the Commission has itself described the temporary authorization procedure 'extraordinary' and one to be employed 'solely in light of the particular problems involved in providing a continuing television service to the people * * *.' Matter of Springfield, Illinois-St. Louis, Mo. Tel. Broadcast Stations, 15 Pike & Fischer RR. 1525, 1537 (1957). See also Matter of Albany-Schenectady-Troy & Vail Television Broadcast Stations, 15 Pike & Fischer RR. 1514(a) (1957) and Matter of Carbondable-Harrisburg, Illinois Tel. Br. Stations, 16 Pike & Fischer RR. 1617 (1958). These considerations necessarily mean that the Commission must set forth with some particularity the reasons for its issuance of such a grant, in such form that a reviewing court can ascertain that all essential factors have received adequate consideration.
 
 
 16
 The intervenor agreed and the Commission asserts that no weight is to be given to the investment involved in the temporary operation or the advantages which inhere in satisfactory interim operation for 2 to 3 years and that this adequately safeguards appellant's rights. It is suggested that to question this involves a challenge to the good faith of the Commission. But this is not a matter only of good faith. Ordinary human experience tells us that these factors have a force which cannot always be set aside by the triers no matter how sincere their effort or intent. The Commission realistically concedes that if the grant is ultimately made to appellant rather than to intervenor, 2 1/2 or 3 years hence, the latter's market to dispose of its large 'temporary' investment in a going television station is 'one man,' i.e., the successful applicant. In that eventuality the losing party faces the problem of salvaging whatever he can on a distress market. To argue, as appellant does, that this may weigh in the balance of an otherwise close question is not a challenge to the good faith or integrity of the triers; it is a recognition that they are mortal men.[5]
 
 
 17
 Where a substantial number of people would be deprived of all service for a long period there could well be an overriding public interest which could be served only by the 'extraordinary procedure' of a temporary grant pending a comparative hearing. But the spirit of the Ashbacker doctrine requires that to justify the granting of 'temporary' authority for so long as 2 1/2 to 3 years, the public interest must be clear and it must be made the subject of explicit findings in the particular case in unmistakable terms; and such deterrent factors as concentration of media and overlap must be explicitly dealt with in findings which afford an adequate basis for appellate review. The theoretical injury to the public which may in some circumstances flow from deferral of the added service is more than offset by a process which makes certain that all essential facors have been fully considered before this important power is exercised.
 
 
 18
 The basic teaching of the Ashbacker case is that comparative consideration by the Commission and competition between the applicants is the process most likely to serve the public. While the Ashbacker case dealt with grants for regular operations, rather than temporary, the reasoning of the Court has much force as applied to 'temporary' authorizations which last for 2 1/2 to 3 years. A 'temporary' grant for such a period so closely approximates a statutory three year license, in which renewal is subject to the same considerations which affect the original grant, that the device of a temporary authority was rightly characterized by the Commission as an 'extraordinary procedure.' That the grant of temporary authorization to one applicant has an inevitable tendency to discourage competitors for construction permits is added reason for us to emphasize that it is a process calling for close scrutiny.
 
 
 19
 We now turn to consideration of the source of the Commission's power to issue temporary authorizations 'pending final action on any applications for regular operations on that channel; * * *' which is the only limit on the authority granted to intervenor. The Commission urges that power to issue this temporary authorization is found in Sec. 1.331 of its Rules and Regulations which provides in part:
 
 
 20
 '(b) Temporary authority may be granted to a licensee or permittee of a broadcast station to operate such station for a period not to exceed 90 days upon request therefor. Any such request should be filed with the Commission at least 10 days prior to the date of the proposed operation, and should be accompanied by a statement giving full particulars as to the purpose for which the request is made. Any temporary authority issued under this section may be cancelled by the Commission without further notice or hearing.'
 
 
 21
 47 C.F.R. 38 (1958).
 
 
 22
 Because of the express terms of the grant for an indefinite period ('pending final action'), this '90 day' section is not controlling.
 
 
 23
 This argument of the Commission is accompanied by the suggestion that Sec. 1.63 of its Rules supports its action here. That Section provides:
 
 
 24
 '(a) Whenever it appears that a station license * * * should be modified, the Commission will notify the licensee * * * in writing of the proposed action and the grounds and reasons therefor and direct him to show cause why an order modifying the license * * * in the manner proposed by the Commission should not be issued.' 47 C.F.R. 14 (1958).
 
 
 25
 This regulation goes on to describe procedures for the licensee to have a hearing on the changes proposed by the Commission. Plainly this is not applicable to our problem. Inferentially the Commission suggests (a) intervenor now operates Station WAFB-TV, U.H.F. at Baton Rouge, (b) the temporary authorization is merely 'a modification' from Channel 28, U.H.F. to Channel 9, V.H.F. This oversimplifies the problem. The heart of this case is which of the competing applicants is best qualified for regular operation of the newly assigned Channel 9 V.H.F. and we categorically reject the idea that this is a simple matter of 'modification' of existing facilities. The Commission did not propose a change in the sense contemplated by Section 1.63 for which change a licensee may demand a hearing; the Commission acted in response to applications filed and in relation to a new V.H.F. channel not previously available at Baton Rouge.
 
 
 26
 There is, however, another Regulation which seems to bear on the present situation. Sec. 1.360(b) provides:
 
 
 27
 '(b) Where a grant of an application would preclude the grant of any application or applications mutually exclusive with it the Commission may if public interest will be served thereby, make a conditional grant of one of the applications and designate all of the mutually exclusive applications for hearing. Such conditional grant will be made upon the express condition that such grant is subject to being withdrawn if, at the hearing it is shown that public interest will be better served by a grant of one of the other applications. Such conditional grants will be issued only where it appears:
 
 
 28
 '(1) That some or all of the applications were not filed in good faith but were filed for the purpose of delaying or hindering the grant of another application; or
 
 
 29
 '(2) That public interest requires the prompt establishment of radio service in a particular community or area; or
 
 
 30
 '(3) That a grant of one or more applications would be in the public interest, and that a delay in making a grant to any applicant until after the conclusion of a hearing on all applications might jeopardize the rights of the United States under the provisions of international agreement to the use of the frequency in question; or
 
 
 31
 '(4) That a grant of one application would be in the public interest and that it appears from an examination of the remaining applications that they cannot be granted because they are in violation of the Communications Act, other statutes, or the provisions of this chapter.' 47 C.F.R. 47 (1958).
 
 
 32
 We are unable to discern why the Commission elected not to rely primarily on Sec. 1.362(b), when we remember that in the Peoples case the Commission grounded its issuance of the temporary authority on former Sec. 1.385(e), from which the present Sec. 1.362(b) is derived. See Peoples Broadcasting Co., 8 Pike & Fischer RR. 275, 284 (1952). Moreover, Sec. 1.362(b)(3) seems to cover precisely the situation in American Broadcasting Co., supra, and Sec. 1.362(b) (2) covers the problem faced in Peoples Broadcasting v. United States, supra. Lastly, the careful wording of this rule, with its restrictive character, recognizes, in spirit, what the Commission has already said in its decisions. See Matter of Springfield, Illinois-St. Louis, Missouri, 15 Pike & Fischer RR. 1525, 1537 (1957). Section 1.362(b) of the Rules and the Commission's previously cautious characterization of that procedure warrant the conclusion that a temporary grant is not only potentially prejudicial to the party or parties not favored but jeopardizes the whole scheme of full comparative consideration. It should be used only in circumstances which meet the Commission's own rules and its own warning that this is an 'extraordinary' step.
 
 
 33
 The case resolves itself into two questions. The first is whether the Commission has power to grant a temporary authorization which will last for at least 2 1/2 years without a preliminary comparative hearing: (a) where an investment of a quarter to a half million dollars is required, (b) where the area presently has existing V.H.F. television service,[6] (c) where the temporary authority is granted to an applicant whose operations raise questions of concentration of mass communications media (AM, FM and TV at New Orleans) even though the temporary grant on Channel 9 displaces the applicant's U.H.F. operation at Baton Rouge.[7] It seems clear under the Peoples Broadcasting case that the Commission has power to issue a temporary authority under Sec. 1.362(b) and under Sec. 309(a) of the Communications Act, without a comparative hearing.
 
 
 34
 The second question is whether the Commission has complied with its own Rules and Regulations in exercising its power under those controlling provisions.
 
 
 35
 Considering the importance of its action and its impact both on intervenor, who will assume large risks of investments and obligations, and upon appellant whose competitive position in the comparative hearing for a construction permit is or may be worsened, the Commission's utterances in support of its action are indeed laconic.[8] The reasoning of the Commission is expressed only in a letter to appellant, but not in any findings; its position is that since it had been determined in the rule making that two V.H.F. stations were desirable at Baton Rouge in place of one V.H.F. and one U.H.F. station, the need at Baton Rouge was both imperative and immediate. There is no indication that the Commission considered the problems arising out of the common ownership in the form of possible overlap of coverage or concentration of mass media. Nor is there any finding or discussion of why the need for the added television service is both imperative and immediate.
 
 
 36
 That its rule making proceeding has determined the general and broad questions does nor relieve the Commission of the obligation to relate the instant action to the prior rule making in a meaningful way. The factual and legal issues involved in granting the S.T.A. are not whether a new channel is ultimately necessary, but whether the service in question is so immediately and imperatively necessary that it must be granted at once in spite of the great financial risk of one party and the possible prejudicial effect on the other who is not favored, and the derogation of the whole comparative hearing concept. The exercise of this 'extraordinary procedure' demands an inquiry and findings as to the television condition at the present time in Baton Rouge; it demands consideration and discussion as to whether the existing service is adequate until the comparative hearing is concluded; and it demands consideration and discussion of the overlap and concentration problems.
 
 
 37
 This is not a matter merely of form; it is substantive. The findings must also show how and why the public interest requires the added interim TV service while it hears and considers the competing applications over the 2 1/2 year period; of course there must be some evidence to sustain the findings. Radio Station KFH Co. v. Federal Communication Commission, 1957, 101 U.S.App.D.C. 164, 166, 247 F.2d 570, 572; Secretary of Agriculture v. United States, 1954, 347 U.S. 645, 654, 74 S.Ct. 826, 98 L.Ed. 1015. If such inquiry has been made, or the criteria in Rules Sec. 1.362(b) applied, it is not revealed in any expression adequate for judicial review. The dissenting opinion of Commissioner Cross rests on the proposition that these factors had not been considered.
 
 
 38
 Though the intent of Congress was to fill the gaps in V.H.F. service throughout the country, we cannot conclude that Congress demands it be pressed in such haste that either all the relevant factors are not considered, or if considered that they are not articulated in meaningful findings.
 
 
 39
 We hold that the procedures for granting a Special Temporary Authority to one of several competing applicants pending a comparative hearing must include such inquiry as is needed to make comprehensive findings on all revelant factors, including, but not limited to, the basis of the 'public need,' and, where appropriate, the question of concentration of mass media, in situations where (a) the public already has some service, or (b) where the 'temporary' operation may well last 2 or 3 years, or (c) where the investment of the 'temporary' operator is so large as to make his failure to prevail in the comparative hearing oppressive on him. We do not think that the public interest demands or that Congress has commanded that the public domain of the airwaves be filled at the earliest possible moment in all circumstances without due regard for these important factors.
 
 
 40
 The Special Temporary Authority issued to the intervenor is vacated and the matter is remanded to the Commission for further proceedings not inconsistent with the views here expressed.
 
 
 41
 Vacated and remanded for further proceedings in the Federal Communications Commission.
 
 
 42
 DANAHER, Circuit Judge (dissenting).
 
 
 43
 A petition was filed with the Commission in October, 1957, for the institution of rule-making proceedings looking to the reassignment of VHF Channel 9 from Hattiesburg, Mississippi to Baton Rouge, Louisiana.[1] The Commission on June 1, 1959, adopted a Report and Order amending its nationwide table of television assignments by shifting Channel 9 to Baton Rouge. The public interest determinations upon which the action was taken appear in 18 Pike & Fischer Radio Reg. 1666, 1669-1670 (1959). The result of the rule-making is not here challenged.
 
 
 44
 On June 15, 1959, intervenor Modern filed an application for a construction permit on Channel 9 at Baton Rouge. On June 18, 1959, Modern asked for special temporary authorization to permit immediate use of the channel. No other application for any type of service on Channel 9 was then before the Commission. Modern expressed its complete willingness to accept the STA conditionally.[2]
 
 
 45
 47 U.S.C.A. 308 and 309, of course, apply to any STA. If upon examination of the pending application the Commission could find that Modern qualified under section 308(b) and that section 309(a) requirements could be met, the Act says the Commission 'shall grant such application.' After the rule-making proceedings had gone forward nearly two years and had clearly established the need for the shift of Channel 9 to Baton Rouge, with the qualifications of Modern already established as it was a licensee on Channel 28, with the pending application disclosing whatever additional data might be required, with only one request before it for an STA, the Commission granted temporary authority to Modern.[3]
 
 
 46
 Community filed no protest under 47 U.S.C.A. 309(c) as the Act clearly would have permitted it to do. Although previously Community had indicated that it might file an application of its own for an STA, it did not do so.[4] It did file a petition for reconsideration under 47 U.S.C.A. 405, only to withdraw it without giving the Commission a chance to pass upon whatever contentions it might choose to submit. I suggest that Community has no standing whatever in this court.[5]
 
 
 47
 In granting the only pending application for an STA, the Commission not only recognized the stipulated terms suggested by Modern but incorporated them into its order. Both Modern and the Commission are bound by them, and 'until and unless the contrary is shown, we must assume that the Commission will act in good faith * * *.'[6]
 
 
 48
 Thus Modern and Community have before the Commission co-pending applications for a construction permit. The applications are mutually exclusive and an Ashbacker hearing must ensue. It may be a matter of years before that hearing can be concluded. Interim service meanwhile can be provided by VHF Channel 9 at Baton Rouge, the public need for which was long since demonstrated and is not under attack. The Commission evolved a practical, and in my view, a proper solution of the problem before it without the slightest impingement upon the respective rights of Modern and Community. The end result, on the other hand, gave the public the benefit of an early and competitive VHF service in Baton Rouge, quite in accord with the rule-making determination. I think the Commission action furthered the purposes of the legislation. On the record here made, we should not substitute our judgment for that of the body whose duty it is to administer the Act. I would dismiss.
 
 
 
 [1]
 Matter of Television Broadcast Stations (Baton Rouge, Louisiana-- Hattiesburg, Mississippi), 18 Pike & Fischer RR. 1666 (June 3, 1959)
 
 
 [2]
 The Special Temporary Authorization contains the usual recital: 'No effect whatsoever will be given to any expenditure of funds by Modern Broadcasting Company of Baton Rouge, Inc. pursuant to the temporary authorization herein in any comparative hearing involving regular operation on Channel 9 in Baton Rouge nor will any preference redound to Modern Broadcasting Company by virtue of temporary operation on Channel 9.' Commissioner Cross voted to deny Modern's request for Special Temporary Authority and dissented from the denial of a stay
 
 
 [3]
 The Commission asserts it cannot complete a comparative hearing on the two competing applications for Channel 9 short of about 2 1/2 years
 
 
 [4]
 The Commission's Brief (p. 15) seems to take the position that what is now before this court for review is the 'public notice' together with 'a letter from the Commission to appellant informing it of the action taken. This letter * * * is, we believe, reviewable to the extent that it represents the Commission's determinations with regard to matters raised in the objections.' Appellant's 'objections,' as we point out, included an objection that the reasons advanced by Modern were insufficient to sustain grant of the S.T.A. Moreover, Commissioner Cross' dissent sharply brought to the attention of the Commission its failure to consider the important issues of overlap of commonly controlled services and concentration of mass media
 
 
 [5]
 The Commission informs us that in only one situation in the past where it has granted a special temporary authorization has it failed to grant the construction permit to the same grantee after a comparative hearing and in that case the temporary grantee was found to have committed a fraud on the Commission
 
 
 [6]
 It is undisputed that Baton Rouge will still have service from one Baton Rouge V.H.F. station. Appellant further contends that there exists, at present, service reaching Baton Rouge from New Orleans. Since the Commission made no findings on this point, we cannot comment on its effect, although if the allegation is true it is obviously relevant
 
 
 [7]
 Intervenor controls WDSU Broadcasting Corp., operator of a V.H.F. Station at New Orleans, and signals of intervenor on Channel 9 at Baton Rouge would overlap with the operator's V.H.F. station at New Orleans
 
 
 [8]
 'The Commission en banc, by Commissioners Doerfer (Chairman), Hyde, Bartley, Lee, Craven, Fort and Cross, took the following actions on July 22:
 WAFB-TV, Channel 28 Modern B/cg Co. of Baton Rouge, La.
 Granted special temporary authority to operate on Channel 9 pending final action on any applications for regular operation on that channel; no effect to be given in any comparative hearing to expenditure of funds or preference as a result of such temporary operation. By letter, denied opposition by AM station WIBR, Baton Rouge. Commissioner Cross dissented. Modern is applicant for Channel 9 which was shifted from Hattiesburg, Miss., to Baton Rouge July 6. Modern's temporary Channel 9 operation will be with ERP of 24.1 dbk (257 kw) visual and 21.3 dbk (135 kw) aural; antenna height 500 ft. Community B/cg Co. (WIBR) has since applied for regular operation on Channel 9. * * *'
 Commissioner John S. Cross dissented.
 This was followed by a letter in July 1959 to appellant advising of denial of its application for a stay of intervenor's special temporary authorization. This letter contains the nearest thing we can discern in the record to a finding of public interest:
 'In our Report and Order in Docket No. 12281 (FCC 59-509) we determined that the public interest would be served by reassigning Channel 9 from Hattiesburg, Mississippi to Baton Rouge, Louisiana in terms of improving the competitive situation in this relatively large market and in terms of providing additional service to populations in need of it.
 We believe that it is equally in the public interest to expedite the advent of a second VHF service at Baton Rouge at the earliest possible time, thereby speeding the improvement in the television situation in the area by enabling the public to receive an additional VHF service. * * *'
 
 
 [1]
 Some measure of understanding of the Commission's problem with respect to VHF and UHF allocations may be gleaned from Owensboro on the Air, Inc. v. United States, 1958, 104 U.S.App.D.C. 391, 262 F.2d 702 and the cases cited in our footnotes, certiorari denied, 1959, 360 U.S. 911, 79 S.Ct. 1296, 3 L.Ed.2d 1261
 
 
 [2]
 Modern noted that if given permission for interim operation on Channel 9 it would be 'willing to conduct such temporary authorization under the express condition that it will expire automatically upon the commencement of any regular operation * * * by a permittee so authorized by final action of the Commission * * *.' It also stipulated that 'no effect whatsoever shall be given to any expenditure of funds * * * and no preference shall be accorded to us by virtue of the grant * * *.'
 
 
 [3]
 Cf. Peoples Broadcasting Co. v. United States, 1953, 93 U.S.App.D.C. 78, 209 F.2d 286
 
 
 [4]
 It did file an application for a construction pemit before the STA was issued
 
 
 [5]
 See Unemployment Compensation Commission of Territory of Alaska v. Aragan, 1946, 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136; Albertson v. F.C.C., 1957, 100 U.S.App.D.C. 103, 243 F.2d 209
 
 
 [6]
 Peoples Broadcasting Co. v. United States, 93 U.S.App.D.C. at page 81, 209 F.2d at page 288