403 F.2d 585
 CONSOLIDATED NINE, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Comint Corporation and Mid-Florida Television Corporation, Intervenors.
COMINT CORPORATION, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Mid-Florida Television Corporation, Intervenor.
 No. 20961.
 No. 21274.
 United States Court of Appeals District of Columbia Circuit.
 Argued March 4, 1968.
 Decided September 3, 1968.
 
 Mr. Thomas H. Wall, Washington, D. C., with whom Messrs. Alan C. Campbell, Dow, Lohnes & Albertson, Edward P. Morgan, Vincent A. Pepper and Reed Miller, Washington, D. C., were on the brief, for appellant in No. 20,961.
 Mr. John D. Lane, Washington, D. C., with whom Messrs. J. Carter McKaig, Washington, D. C., and Paul C. Perkins, Orlando, Fla., were on the brief, for appellant in No. 21,274 and intervenor in No. 20,961.
 Mr. John H. Conlin, Associate General Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, and Stuart F. Feldstein, Counsel, Federal Communications Commission, were on the brief, for appellee. Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, also entered an appearance for appellee. Mr. Robert D. Hadl, Counsel, Federal Communications Commission, entered an appearance for appellee in No. 20,961.
 Mr. Paul Dobin, Washington, D. C., with whom Mr. Joel H. Levy, Washington, D. C., was on the brief, for intervenor Mid-Florida Television Corporation.
 Before BASTIAN, Senior Circuit Judge, and BURGER and TAMM, Circuit Judges.
 BURGER, Circuit Judge:
 
 
 1
 This is an appeal by Consolidated Nine, Inc. and Comint Corporation from an opinion and order of the Federal Communications Commission which denied an application for interim operating authority and granted authority to Mid-Florida Television Corporation, Intervenor here, to continue the operation of channel 9 pending resolution of a new comparative hearing before the Commission. Consolidated Nine is an open-end joint group in which four of the contending applicants have joined to propose a joint interim operation of the facility. This is spelled out more fully later.
 
 
 2
 In one way or another, the basic problem involved here has been before the Commission for over a dozen years and is now in this court for the fourth time. The history and background are therefore important to an understanding of the case, its complexity makes it necessary to set it forth in some detail.
 
 
 3
 * THE HISTORY OF THE CHANNEL 9 PROCEEDINGS
 
 
 4
 In 1954 and 1955 comparative hearings were held on the mutually exclusive applications of Mid-Florida Television Corporation (Mid-Florida) and WORZ, Inc. (WORZ) for a construction permit for channel 9, a VHF television frequency assigned to Orlando, Florida. On June 7, 1957, the Commission granted the application of Mid-Florida. 22 F.C.C. 1254 (1957). WORZ appealed to this court, which affirmed the Commission's conclusion. WORZ, Inc. v. FCC, 103 U.S.App. D.C. 195, 257 F.2d 199 (1958). The Supreme Court granted certiorari, but, in light of the representations by the Solicitor General, in his opposition to the writ, that intervening Congressional investigations had indicated possible improper ex parte representations had been made to a member of the Commission concerning the qualifications of WORZ while the applications were pending, the Court vacated the judgment of this court, and remanded for such action as this court might thereafter deem appropriate. WORZ, Inc. v. FCC, 358 U.S. 55, 79 S.Ct. 114, 3 L.Ed.2d 48 (1958).
 
 
 5
 This court vacated the Commission's order awarding channel 9 to Mid-Florida and remanded the case to the Commission with instructions that it hold hearings to determine the nature and scope of the alleged ex parte approaches to the Commission. The court also provided that "[i]n the discretion of the Commission existing services may be maintained." WORZ, Inc. v. FCC, 106 U.S. App.D.C. 14, 15, 268 F.2d 889, 890, cert. denied, 361 U.S. 805, 80 S.Ct. 104, 4 L.Ed.2d 56 (1959). By this time, Mid-Florida had begun to broadcast on channel 9 and the Commission allowed this authorization to stand undisturbed while it conducted the hearings we ordered. After the hearings, the Commission concluded that neither WORZ nor Mid-Florida was disqualified from operating the station and decided to hear new oral argument and to award the station on the basis of the original record. This court did not disturb the finding that neither of the applicants was disqualified to operate the station. But it did agree with the dissent of the Commission Chairman that, after the oral argument, the Commission would be authorized to decide whether to grant the application of Mid-Florida or of WORZ or to reopen the record for new applications. WORZ, Inc. v. FCC, 116 U.S.App.D.C. 316, 323 F.2d 618 (1963), cert. denied, 376 U.S. 914, 84 S.Ct. 664, 11 L.Ed.2d 611 (1964). The Commission, however, declined to reopen the record and again determined that Mid-Florida was the better qualified of the two applicants. WORZ, Inc., 36 F.C.C. 1535 (1964). On appeal, this court vacated the Commission's decision and remanded the proceedings to the Commission to reopen the record and permit new applicants for the authority to operate channel 9.
 
 
 6
 We noted both the age of the record — ten years — and the "nagging uncertainty as to whether so vital a community facility as is involved here should not be exposed to what may possibly be wider interests than those represented by these two applicants." WORZ, Inc. v. FCC, 120 U.S.App.D.C. 191, 192, 345 F.2d 85, 86 (1965). The Commission was again authorized to grant "[t]emporary authority for the continued operation of the station." Ibid. The Commission then opened the proceedings for new applications for channel 9 and authorized Mid-Florida to continue its operation of the station. The Commission stated that this operation was to be "without prejudice to, and constitute no preference in any respect of any proceeding to be held with respect to Channel 9, in Orlando, Florida." WORZ, Inc., 1 F.C.C.2d 1377 (1965).
 
 
 7
 By the new cut-off date the Commission set for applications for channel 9, a total of eight applicants had filed for authority. Four of the new applicants (Central Nine Corporation, TV 9, Inc., Florida Heartland Television, Inc., and Comint Corporation) each applied for authority to operate channel 9 in the interim period before final authorization was determined. Subsequently, three of these applicants dropped their requests for individual interim operating authority and formed Consolidated Nine, Inc. Consolidated Nine was incorporated for the purpose of applying for and if successful, operating, channel 9 in the interim before comparative hearings were held. It was an open-ended group, with provisions that any applicant for permanent authority could participate with the original incorporators on an equal basis. Four of the six remaining applicants for permanent authority are participants in Consolidated Nine. Comint and Mid-Florida did not join Consolidated Nine. Comint has continued to pursue its application for individual interim authority as well as offering to belong to an interim group should the Commission direct that one be created. Mid-Florida opposed interim grants to either Consolidated Nine or Comint and requested that the Commission continue the status quo by allowing Mid-Florida to operate channel 9 pending the outcome of the comparative hearing.
 
 
 8
 On March 29, 1967, the Commission entered an order dismissing the application of Comint and granting Mid-Florida's request to continue its operation of channel 9. Consolidated Nine, Inc., 7 F.C.C. 2d 801 (1967). In dismissing Comint's application, the Commission stated: "Since Comint Corp.'s application does not afford all of the applicants a reasonable opportunity to participate with it in seeking the conditional grant, its request for interim authority must be dismissed for failure to comply with the rules."[1] Id. at 802. Because of Comint's willingness to participate with other applicants in an interim operation, Comint was treated by the Commission as a "prospective stockholder" in Consolidated Nine. In choosing between continued operation by Mid-Florida and an interim grant to Consolidated Nine, the Commission stated why it favored Mid-Florida over the proposed joint operation by Consolidated Nine as follows:
 
 
 9
 A joint interim operation has serious drawbacks. First, it requires a substantial investment in new facilities. Secondly, it would bring together a new management group consisting mainly of adversary parties. This is an inherently undesirable situation. Joint operation by conflicting parties to a hearing is hardly conducive to satisfactory long-range planning, leaves responsibility in doubt, and does not provide a sound basis for, or incentive to, special efforts to serve the community's needs. Our experience with joint interim operations indicates that this arrangement may serve to delay the outcome of the comparative hearing, and that it provides poorer management than station operation under the control of one party. An interim authorization is primarily useful when there is no existing service, or an existing licensee has been disqualified.
 
 
 10
 Consolidated Nine, Inc., 7 F.C.C.2d 801, 805 (1967).
 
 
 11
 Comint and Consolidated Nine both appeal. Comint claims that if it is subject to rule 1.592(b) requiring that its interim operation be open to all applicants, then the Commission abused its discretion by not applying the same rule to Mid-Florida. Consolidated Nine urges that it was an abuse of discretion for the Commission to permit one of several competing applicants for permanent authority to operate a channel pending an Ashbacker[2] hearing and that this action was contrary to our holding in Community Broadcasting Co. v. FCC, 107 U.S.App.D.C. 95; 274 F.2d 753 (1960).
 
 II
 
 12
 Grants of interim broadcast authority, while not frequent, are not novel matters for review in this court. The requirement of Ashbacker Radio Co. v. FCC, 326 U.S. 327, 66 S.Ct. 148 (1945), that mutually exclusive broadcast applications be accorded comparative hearings created a practical problem of whether there was any way to provide for operation of a station pending the comparative hearing. In Peoples Broadcasting Co. v. United States, 93 U.S.App.D.C. 78, 209 F.2d 286 (1953), this court held that interim grants of authority may be made without necessarily violating the parties' Ashbacker rights. In Peoples Broadcasting, the Commission permitted the operator of a prior channel that had been removed from the Lancaster, Pennsylvania area to temporarily operate the new channel allocated to Lancaster pending a comparative hearing on the authority to operate the new channel. In affirming, the court relied upon section 309(c) of the Communications Act of 1934, as it then read.[3] That section provided that the Act's automatic stay of any grant under protest would not operate when the grant was to continue existing services, which was the case in Peoples Broadcasting. In addition, the temporary authorization was to the only station operating in Lancaster.
 
 
 13
 However, there are inherent difficulties with such interim grants from the standpoint of potential prejudice to a full and fair Ashbacker hearing. In Community Broadcasting Co. v. FCC, 107 U.S.App.D.C. 95, 274 F.2d 753 (1960), we held that the Commission had acted improperly in granting interim operating authority to one of two competing applicants for a permanent grant. We emphasized that the interim operation there would entail an investment of over $250,000. The tendency of this circumstance would be to prejudice the other applicant notwithstanding the Commission's good faith in trying to disregard the potential economic loss if the temporary operator were denied the final grant: "Ordinary human experience tells us that these factors have a force which cannot always be set aside by the triers no matter how sincere their effort or intent." Id. at 101, 274 F.2d at 759. In addition, Community Broadcasting held that "the spirit of the Ashbacker doctrine requires that to justify the granting of `temporary' authority for so long as 2½ to 3 years, the public interest must be clear and it must be made the subject of explicit findings in the particular case in unmistakable terms; * * *." Ibid. There was no express finding by the Commission in Community Broadcasting on the public interest — public need — for service before a comparative hearing could be completed. Although such explicit findings were found to be required by "the spirit of the Ashbacker doctrine" they were also required by the Communications Act as it read at the time of Community Broadcasting.[4] That statute has since been amended[5] so that the Commission's authority to grant interim operating authority is apparently limited to "emergency" situations.[6] While the Commission here relies upon the terms of our remand (see p. 587, supra), and not the Act, for its authority to grant the temporary authority to operate channel 9, the requirements of a fair Ashbacker hearing, as outlined by Community Broadcasting, suggest careful scrutiny by the Commission of any actions that would tend to interfere with impartial comparative hearings.
 
 
 14
 When analyzing grants of temporary or interim authority, it is necessary to distinguish the several situations in which it may occur. When a licensee who has fully qualified and is operating a station makes a timely request for a renewal, the Act provides that the licensee shall continue to operate the station pending any hearings by the Commission. 47 U.S.C. § 307(d) (1964). In the present case, of course, Mid-Florida cannot qualify for such a carry-over because it has never received a valid license. In two cases also growing out of ex parte approaches to a Commissioner while comparative hearings were pending, the Commission awarded licenses to the only remaining "untainted" applicants, but for a period of only four months, rather than the customary three years. Such a course is an appropriate exercise of the Commission's discretion. WKAT, Inc. v. FCC, 111 U.S.App.D.C. 253, 261, 296 F.2d 375, 383 (1961), cert. denied, sub nom. Public Service Television, Inc. v. FCC, 368 U.S. 841, 82 S.Ct. 63, 7 L.Ed.2d 40 (1961). In such cases, in the comparative hearing when the licensee applies for a renewal, the experience of the short-term licensee may be considered by the Commission, Community Broadcating Corp. v. FCC, 124 U.S.App. D.C. 230, 363 F.2d 717 (1966), and some credit may be given for its broadcasting performance. South Florida Television Corp. v. FCC, 121 U.S.App. D.C. 293, 349 F.2d 971 (1965), cert. denied, 382 U.S. 987, 86 S.Ct. 541, 15 L.Ed. 2d 475 (1966). But in these cases there was a valid grant to the person in operation of the station. In the present case all prior grants of operating authority to Mid-Florida have been vacated except for the temporary interim grant made after the most recent remand, 1 F.C.C.2d 1377, and the authority to continue that interim operation is here under appeal.
 
 
 15
 Community Broadcasting dealt with an interim grant to one of several applicants for authority to operate a station where there was no present operator of that frequency.[7] This situation can occur either where a new frequency is authorized for an area or where a prior licensee does not seek renewal or is disqualified by the Commission. In such cases, the Commission has applied Community Broadcasting standards by granting interim operating authority to a nonapplicant for the regular license, Oak Knoll Broadcasting Corp., 2 Pike & Fischer R.R.2d 1011 (1964), and by granting interim operating authority to a group of seven of the eleven applicants for regular authority. Pike-Mo Broadcasting Co., 2 F.C.C.2d 207, aff'd sub nom. Beloit Broadcasters, Inc. v. FCC, 125 U.S.App.D.C. 29, 365 F.2d 962 (1966). In Beloit Broadcasters this court noted that "[t]he diffused composition of [the interim operator] minimized the likelihood of significant prejudice to the ultimate disposition of the frequency resulting from an interim grant to it." Id. at 30-31, 365 F.2d at 963-964.
 
 
 16
 The problems now before us do not fall precisely into either category. While Mid-Florida does not hold a valid license that is presently up for renewal, the frequency is not dormant. Mid-Florida is the current operator albeit without ever having been selected through a valid comparative process.[8] The Commission has analogized the present grant to Mid-Florida to other grants made when a remand has required further proceedings before a licensee is entitled to a regular license.[9] These cases support the Commission's order immediately after our remand permitting Mid-Florida to continue its operation of channel 9. 1 F.C.C. 2d 1377.
 
 
 17
 The issue on this appeal, however, is whether the Commission properly determined which party could operate channel 9 for the interim period after it had received competing applications for interim authority. None of the cases cited in note 9, supra, involved a remand which ordered new comparative hearings. Each, instead, involved a determination of whether the prior comparative hearings had been properly conducted.[10] Consequently, they do not present the problem of whether the prejudice to a comparative hearing under Community Broadcasting dictates the same treatment on this remand as in cases where a frequency is open, with no presently qualified operator.
 
 III
 
 18
 In reviewing the present grants of interim authority, the first factor of importance is the new investment that would be involved in any of the proposed interim operations. Community Broadcasting, Inc. v. FCC, 107 U.S.App.D.C. 95, 274 F.2d 753 (1960). In these proceedings the Commission has been alert to the possible prejudice that might ensue if one applicant were permitted to make a substantial investment on the strength of a grant of temporary authority. The Commission's order permitting Mid-Florida to continue to operate channel 9 was specifically conditioned upon its not expending any funds pursuant to an agreement already entered to share the new proposed transmission facilities of an applicant for another channel authority. The Commission, in so conditioning the grant, stated that "such an investment [$192,250], during the temporary operation, could prejudice the other applicants in the hearing," citing Community Broadcasting.
 
 
 19
 The Commission's opinion reveals that the application of Consolidated Nine predicted $1,393,000 in construction costs and $1,300,000 in estimated first-year expenses. The application estimated only $1,500,000 in first-year revenues. Consolidated Nine, Inc., 7 F.C.C. 801, 803 (1967). Thus the first year of interim operation would involve an estimated $1,200,000 operating deficit. Of course, this deficit would be shared by at least four applicants rather than by only one applicant as in Community Broadcasting. See Beloit Broadcasters, Inc. v. FCC, 125 U.S.App.D.C. 29, 31, 365 F.2d 962, 964 (1966).
 
 
 20
 The Commission noted that Consolidated Nine was unsuccessful in its attempts to arrange to buy or lease the broadcast facilities of Mid-Florida for an interim operation.[11] Certainly, this would contribute to the cost for Consolidated Nine that the Commission denotes as construction costs. However, there is no record of what difference the inability to lease or purchase the facilities would make in the total cost to Consolidated Nine; this type of computation is made uncertain by such variables as the terms of sale or rental that might have been agreed upon and how much sooner such arrangements would have permitted Consolidated Nine to come on the air than if it had to construct its own facilities. There is, of course, no obligation on Mid-Florida to make its facilities available to adverse parties seeking interim authority except the inescapable economic realities which could exert some force. On the other hand, however, the refusal of Mid-Florida to either join the Consolidated Nine group or to make its facilities available stands in stark contrast to the Commission's rule under which both Consolidated Nine's and Comint's applications were considered, that requires any interim operation proposal to be open to all applicants.[12] Clearly Mid-Florida's continuing operation is not open to others, and the inability of Consolidated Nine to secure the facilities for its joint interim operation may well be properly accorded a limited importance in light of the Commission's own rules.
 
 
 21
 The second reason the Commission gave for its disapproval of Consolidated Nine's application was that "it would bring together a new management group consisting mainly of adversary parties." This, the Commission concluded, "is an inherently undesirable situation." Consolidated Nine, Inc., 7 F.C.C.2d 801, 805 (1967).[13]
 
 
 22
 The Commission's argument on the undesirability of a joint interim operation leads to a serious difficulty. If Mid-Florida is allowed to be the interim operator because, in part, joint interim operations have serious disadvantages, then the appeal by Comint raises a knotty problem. Comint applied, not for joint interim operating authority, but for a single-operator authority. In fact, three of the participants in the joint application of Consolidated Nine originally submitted individual requests for interim authority that were withdrawn when Consolidated Nine was formed, apparently in the expectation that they would be improper under rule 1.592(b). These parties were thus "trapped" by the Commission's treatment of the interim authority situation here: Comint, which sought sole interim authority, had its application dismissed for failure to propose a joint operation; those who joined in Consolidated Nine, proposing a joint operation and otherwise complying with rule 1.592(b), had their application denied because a joint operation was "inherently undesirable." Meanwhile, the interim grant went to Mid-Florida who had made no application at all and who, like Comint, had failed to offer the other applicants an opportunity to share in an interim operation.
 
 
 23
 Under these circumstances, we reluctantly reach the conclusion that the Commission's inconsistent treatment of the several applicants and favored treatment of Mid-Florida because of its prior operation constitute an abuse of the discretion contemplated by the remand.
 
 
 24
 The Commission has argued that the reason that rule 1.592 does not apply to Mid-Florida is that it was not intended to deal with the continued operation of an existing station, but rather with stations where either the prior licensee lost its license or new channels were allocated by the Commission; these were situations where the competing applicants were not presently operating the station.
 
 
 25
 But if the rule does not apply to the present situation, then it is difficult to understand why it was applied to Comint, and apparently to those parties who were led to form Consolidated Nine. If Mid-Florida is subject to different requirements in terms of its proposals for interim operations due to the fact that it is now operating the station, then we are faced with an inconsistency within the rulings by the Commission in these proceedings: when its authority to operate the station was given after our latest remand decision, Mid-Florida was told by the Commission that its continued operation of the station would be "without prejudice to, and constitute no preference in any respect of any proceeding to be held with respect to Channel 9, in Orlando, Florida." 7 F.C.C.2d at 809. Yet, in the very next proceeding with respect to channel 9, the rules were different for Mid-Florida from those for the other applicants. Clearly, there was a "preference" for Mid-Florida, not simply in the ultimate choice of who should run the station in the interim, but in the method by which that choice was made. We have no doubt that the fact that Mid-Florida was already operating the station is entitled to weight. Not only would there be no new and added expenses to go on the air, but also there are disadvantages with joint interim operations and the continuity of service would be better provided by Mid-Florida's continued service than by a new operator who might be forced to construct new facilities,[14] unless it could ultimately acquire use of existing facilities.
 
 
 26
 We are aware that if Consolidated Nine's or Comint's application had been granted there would have been a delay before either was in a position to go on the air — assuming of course, that Mid-Florida did not sell or lease its facilities or join the open-ended Consolidated Nine. This factor may well seem inconsistent with the grant by this court of discretion to permit the "continued operation" of the station. However, this consideration was not advanced by the Commission. Chenery Corp. v. SEC, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).
 
 
 27
 The factor that this court identified in Community Broadcasting as most heavily prejudicing the rights of competing applicants by an interim grant was the investment made by the successful applicant for interim authority. The Commission subsequently issued rule 1.592, which it now tells us is designed to deal with cases where there is no carry-over or existing qualified operator of the channel, and it is in the public interest to keep the channel on the air. That rule requires that any application for interim authority be open to all applicants, unless the application meets one of the four special situations in rule 1.592(a). But the Commission argues that rule 1.592 (b)'s requirement that the application for interim authority be open to all applicants for regular authority does not apply to the situation where there is already a licensee operating the station.
 
 
 28
 The Commission does not suggest that the present case is that of a carry-over operation under section 307(d) of the Communications Act, 47 U.S.C. § 307 (d) (1964) and rule 1.62, 47 C.F.R. § 1.62 (1968); under that section a timely application for a renewal of a valid license keeps the original license in effect until the renewal application has been acted upon. There was no valid license in the present proceedings since the prior grants of authority by the Commission to Mid-Florida have been vacated. It is for this reason, no doubt, the Commission emphasizes that it is acting not under its rules, but under the terms of the prior remand from this court which permitted continued operation if the Commission so decided.
 
 
 29
 There are, however, factors other than the financial investment of the successful interim operator which should be taken into account, especially where, as here, whether Mid-Florida or Consolidated Nine is given the interim grant there will be no new financial investment made by a single applicant, but rather by none if Mid-Florida succeeds and by at least four applicants if Consolidated Nine succeeds.[15] The absence of the preferential economic factor merely leads to the necessity to examine other factors to determine if the disposition in question has produced any prejudice to the Ashbacker rights of the parties. One factor that we cannot ignore, and think the Commission should have weighed, and now must weigh, was the influence of Mid-Florida's operation of the station for over eight years without ever receiving a valid grant of authority or having emerged successfully from a valid comparative hearing for the license. This is surely an anomaly when we recall that three years is the longest permissible period for a standard license. 47 U.S.C. § 307 (d) (1964). Certainly, there is even greater reason for a temporary grant to be for a lesser period of time, and more prejudice to competing applicants from the fact that Mid-Florida's position is now being characterized as the "status quo" which the Commission, at least in these interim proceedings, has concluded should be preserved.
 
 
 30
 There is another side to the economic argument that Mid-Florida will not have to construct new facilities in order to continue broadcasting. The initial costs have been incurred and, presumably, Mid-Florida is by now making a profit from the operation of the station. Appellants challenge this profit-pending-decision as unfair. They emphasize the expense of participating in the long comparative hearing process and the relative ease for the profit-making interim operator to meet these expenses. The paramount interest in a license determination is that of the public and that interest can yield to no other. Hence, the only relevance of the economic pressures on the parties is in determining whether those pressures will influence the choice of the licensee. This was the thrust of our holding in Community Broadcasting. The mere unfairness of the economic pressures on one party or the other is not of paramount importance. We emphasize that in referring to the "public interest" we do not limit this to the creation or maintenance of a broadcast facility; the public has a far greater interest in the fairness of the licensing process than in simply adding — or keeping — one more broadcast facility on the air.
 
 
 31
 As we noted in Community Broadcasting, one of the tests for this court on review from an interim grant is whether the Commission has complied with its own rules in making the award. The Commission cites no rule to support its apparent premise that an "existing operator" holding no valid license is entitled to remain in operation pending long drawn out comparative hearings. Both our opinions and the statements of the Commission in the present proceedings have expressly announced that Mid-Florida would be entitled to no preference in subsequent proceedings. We do not hold that the Commission could not have made an award of interim operating authority pursuant to our grant of discretion pending the remand decision absent specific Commission rules to cover such a situation. What we hold is first, that it is an abuse of discretion for the Commission to give a procedural preference to the existing operator, as opposed to merely weighing the fact of its present operation, when comparing it on an equal basis with others who propose to operate the station in the interim. Second, we hold that it was an abuse of the Commission's discretion to apply rule 1.592(b) to these proceedings and simultaneously grant interim authority to Mid-Florida in violation of that rule.
 
 
 32
 We again remand the record to the Commission for reconsideration and disposition not inconsistent with this opinion.
 
 
 33
 Having concluded that there is no valid grant of interim operating authority, the grant to Mid-Florida must be vacated. If the Commission elects to grant a lawful interim authority pending the selection of the permanent licensee through the comparative hearing process, service can be continued. We do not intimate that a grant of interim authority must in all circumstances be made.
 
 
 34
 This case comes very close to presenting a factual and legal situation in which we might well be warranted in directing that the interim authority which we now vacate be granted forthwith to one or the other of the competing applicants who are Appellants here. But we are persuaded to exercise restraint since it might be entirely appropriate to have no interim operator at all. A community with multiple station coverage has in the past and will in the future survive greater inconveniences than having one facility remain off the air for whatever period is needed to conduct the business of the Commission fairly and according to law.
 
 
 35
 This case is remanded to the Commission to vacate the interim grant to Mid-Florida. We retain jurisdiction pending further proceedings before the Commission.
 
 
 36
 So ordered.
 
 
 
 Notes:
 
 
 [1]
 The Commission cited rule 1.592(b), which provides:
 When two or more applications for the same television assignment have been designated for hearing, the Commission may, if the public interest will be served thereby, make a conditional grant to a group composed of any two or more of the competing applicants, such grant to terminate when the successful applicant commences operation under the terms of a regular authorization. No conditional grant will be made unless all of the competing applicants have been afforded a reasonable opportunity to participate in the group seeking the conditional grant. In its application, the group shall include a special showing as to the need for the service pending operation by the successful applicant under the terms of a regular authorization; the effect, if any, of a grant on the position of any applicant which is not a member of the group; and any other factors which are deemed pertinent to the public interest judgment.
 
 
 [47]
 C.F.R. § 1.592(b) (1968)
 
 
 [2]
 Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), requires a comparative hearing on mutually exclusive applications for broadcast authority
 
 
 [3]
 See notes 4 & 5infra.
 
 
 [4]
 47 U.S.C. § 309(c) (1958), Act of January 20, 1956, ch. 1, 70 Stat. 3:
 pending hearing and decision the effective date of the Commission's action to which protest is made shall be postponed to the effective date of the Commission's decision after hearing, unless the authorization involved is necessary to the maintenance or conduct of an existing service, or unless the Commission affirmatively finds for reasons set forth in the decision that the public interest requires that the grant remain in effect, in which event the Commission shall authorize the applicant to utilize the facilities or authorization in question pending the Commission's decision after hearing.
 
 
 [5]
 Act of September 13, 1960, Pub.L. 86-752, § 4(a), 74 Stat. 889
 
 
 [6]
 47 U.S.C. § 309(e), (f) (1964); Folkways Broadcasting Co. v. FCC, 126 U.S. App.D.C. 123, 379 F.2d 447, 448 n. 1 (1967). Section 309(f) permits a 90-day emergency operation, renewable once, in "extraordinary circumstances requiring emergency operations in the public interest * * * [where] delay in the institution of such emergency operations would seriously prejudice the public interest * * *."
 
 
 [7]
 InCommunity Broadcasting the fact that the interim operator was already operating a UHF frequency in the vicinity was not considered significant. It was necessary to construct new facilities even for an interim operation. In Peoples Broadcasting Co. v. United States, 93 U.S.App.D.C. 78, 209 F.2d 286 (1953), the interim authority was construed as a continuation of existing services when the operator of another VHF frequency was merely authorized to change its frequency when the Commission removed its prior frequency and added a new one to the area in question. In Peoples Broadcasting, the prior operator had received a valid broadcasting license.
 
 
 [8]
 In Community Broadcasting Corp. v. FCC, 124 U.S.App.D.C. 230, 363 F.2d 717 (1966), and South Florida Television Corp. v. FCC, 121 U.S.App.D.C. 293, 349 F.2d 971 (1965), cert. denied, 382 U.S. 987, 86 S.Ct. 541, 15 L.Ed.2d 475 (1966), the remand proceedings revealed that of the prior applicants there was only one qualified applicant. In effect, therefore, the four-month licenses were "interim" grants made without full comparative hearings. However, we are aware of no challenge to these grants except as to the credit which the Commission gave for such operations in the later comparative hearings, Community Broadcasting Corp. v. FCC,supra; South Florida Television Corp. v. FCC, supra, and to the propriety of replacing the operator found to be disqualified. WKAT, Inc. v. FCC, 111 U.S.App.D.C. 253, 296 F.2d 375 (1961), cert. denied, sub nom. Public Service Television, Inc. v. FCC, 368 U.S. 841, 82 S.Ct. 63, 7 L.Ed.2d 40 (1961).
 
 
 [9]
 See Braniff Airways, Inc. v. CAB, 113 U.S.App.D.C. 132, 136, 306 F.2d 739, 743 (1962); Sangamon Valley Television Corp. v. United States, 106 U.S.App.D.C. 30, 34, 269 F.2d 221, 225 (1959); Wrather-Alvarez Broadcasting, Inc. v. FCC, 101 U.S.App.D.C. 324, 329, 248 F.2d 646, 651 (1957); Greensboro-High Point Airport Authority v. CAB, 97 U.S. App.D.C. 358, 363, 231 F.2d 517, 522 (1956); American Broadcasting Co. v. FCC, 89 U.S.App.D.C. 298, 191 F.2d 492 (1951).
 
 
 [10]
 InBraniff Airways, the remand was to permit the Board to enter adequate findings to afford judicial review of a route award; in Sangamon Valley Television, the remand, like that earlier in these proceedings (WORZ, Inc. v. FCC, 106 U.S.App.D.C. 14, 268 F.2d 889 (1959), cert. denied, 361 U.S. 805, 80 S.Ct. 104, 4 L.Ed.2d 56 (1960)) was to determine whether or not there had in fact been any ex parte approaches to a Commissioner which would require the disqualification of any applicant; in Wrather-Alvarez, the remand was to consider the character of the programming of a Mexican station in deciding whether to permit an American network to partially affiliate with it; in the Greensboro-Highpoint case, the remand was to have the Commission answer the charge of certain localities that the award in question discriminated against them; and in American Broadcasting Co., the remand was for the Commission to make a long-delayed decision on the permanent frequency allocation for a station that was given a temporary allocation when its authorized frequency was removed by treaty from permissible American channels.
 
 
 [11]
 In Pike-Mo Broadcasting Co., 2 F.C.C. 207, 209 (1965), aff'dsub nom. Beloit Broadcasters, Inc. v. FCC, 125 U.S.App. D.C. 29, 365 F.2d 962 (1966), the interim grantee was given a grant which entailed its building facilities anew because the prior operator of the station would not offer satisfactory terms for sale or lease of its facilities. The Commission gave the successful joint interim applicant 30 days to attempt to negotiate more favorable sale or lease terms and to petition for a modification of the facilities granted by the Commission, if it was successful. Id. at 209 n. 4.
 
 
 [12]
 Interim operations applications may be for single operation by one operator, if they meet one of the conditions set forth in rule 1.592(a), 47 C.F.R. § 1.592(a) (1968), none of which are pertinent here
 
 
 [13]
 One stated reason is inconsistent with the apparent thrust of the "interim" authority. The Commission stated that joint operations by competitors "is hardly conducive to long-range planning." 7 F.C.C.2d at 805. Although all interim operators have so far been granted the permanent authority or have merged into the group that obtained it, this is definitely not the theory of interim operations. The "interim" is just that and the Commission has made clear that it should not in any way prejudice the eventual choice of regular authority
 
 
 [14]
 Consolidated Nine offered to construct its facilities on a "crash" basis. But this merely points out that there would be a time lag from the grant until the commencement of operations, which themselves were intended to be only for the "interim."
 
 
 [15]
 See Beloit Broadcasters, Inc. v. FCC, 125 U.S.App.D.C. 29, 365 F.2d 962, 964 (1966).