KODIAK AIRWAYS, INC., Petitioner,

v.

CIVIL AERONAUTICS BOARD,
Respondent.

Wien Consolidated Airlines, Inc., Western
Air Lines, Inc., Intervenors.

No. 24483.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 20, 1971.

Decided July 19, 1971.

Mr. Jerrold Scoutt, Jr., Washington, D. C., for petitioner. Mr. Warren C. Nighswander, Washington, D. C., also entered an appearance for petitioner.

Mr. O. D. Ozment, Deputy Gen. Counsel, Civil Aeronautics Board, with whom Messrs. R. Tenney Johnson, Gen. Counsel, Warren L. Sharfman, Associate Gen. Counsel, Litigation and Research, and Ivars V. Mellups, Atty., Civil Aeronau-

tics Board, were on the brief, for respondent. Mr. Howard E. Shapiro, Atty., Department of Justice, also entered an appearance for respondent.

Mr. Theodore I. Seamon, Washington, D. C., with whom Mr. Gerald P. O'Grady, Los Angeles, Cal., was on the brief, for intervenors. Mr. Joseph D. Sullivan, Washington, D. C., also entered an appearance for intervenor Wien Consolidated Airlines, Inc. Mr. Ernest T. Kaufmann, Washington, D. C., also entered an appearance for intervenor Western Air Lines, Inc.

Before TAMM, MacKINNON and WILKEY, Circuit Judges.

TAMM, Circuit Judge:

In its Order 70–7–113, dated July 23, 1970, the Civil Aeronautics Board (hereinafter "the Board") allowed Western Air Lines, Inc. (hereinafter "Western") to temporarily suspend service on a certain intra-Alaskan air route. In the same order the Board granted Wien Consolidated Airways, Inc. (hereinafter "Wien") a temporary exemption from the certification requirements of section 401 of the Federal Aviation Act of 1958, 49 U.S.C. § 1371 (1964). This exemption authorized Wien to serve the route pending completion of proceedings being held to determine which carrier should be given certification authority to provide this service. The Board also approved an agreement between Western and Wien which provided that Western would assign and sublease certain terminal facilities to Wien and that Wien would employ Western personnel working at these facilities.

Kodiak Airways, Inc. (hereinafter "Kodiak"), one of the applicants for certification authority, asks us to set aside the Board's three interrelated actions on the ground that in granting Wien exemption authority the Board did not comply with the statute governing such grants, section 416(b) of the Aviation Act, 49 U.S.C. § 1386(b) (1964). Before reaching the merits of this claim, however, we must first decide whether Kodiak has sufficient interest in Order 70–7–113 to challenge it.

I. History of the Case

The route segment in question here extends from Anchorage to Kodiak and includes intermediate stops at Kenai and Homer. Prior to the grant of exemption authority to Wien this route was served exclusively by Western, which was certificated for the route. Western was also the only carrier operating scheduled nonstop flights between Kodiak and Seattle.

The proceedings in this case began in 1968 when Kodiak, Northern Consolidated Airlines, Inc., later to become Wien Consolidated Airways, Inc. by virtue of its merger with Wien Alaska Airline, Inc., and Alaska Airlines, Inc. (hereinafter "Alaska") filed applications for exemption authority to provide additional service in several of the markets of the Anchorage-Kodiak route segment. In Order 69–3–68, issued March 19, 1969, the Board denied these applications for exemption authority. In the same order the Board instituted the *Alaska Service Investigation,* which was designed:

> to examine the entire Alaskan air route structure to determine what changes are necessary to provide for better service to the public, improved scheduling and operational flexibility for the carriers, elimination of uneconomic and wasteful competition, and reduction of federal subsidy payments.

(*Id.* at 1.) Included in the investigation were the questions of authorizing new or additional service in the Kodiak, Homer, Kenai and Anchorage markets and of terminating or modifying Western's authority to serve these markets.

On February 2, 1970, Western and Wien filed a joint application requesting temporary suspension of Western on the route in question and a temporary exemption for Wien to provide replacement service pending final resolution of the

*Alaska Service Investigation.*[1] The joint application also requested approval of an agreement whereby Western contracted to sell Wien its ground property and equipment and assign or sublease its interests in terminal facilities located at the Kenai, Homer and Kodiak stations,[2] with the proviso that this property was to be re-transferred to Western if Wien was not granted certification authority to serve the route. Western's employees at the stations involved were to be offered employment by Wien and integrated into its seniority structure and employment plan. Contemporaneous with the consummation of this agreement and the filing of the joint application, Western discontinued its nonstop flights between Seattle and Kodiak.

Kodiak, Alaska, and Western Alaska Airlines, Inc. (hereinafter "Western Alaska") filed answers in opposition to the joint application and applications of their own for exemption authority to provide service between Kodiak and Anchorage.[3] They also applied for certification authority over the Anchorage-Kenai-Homer-Kodiak route, and the Board consolidated these applications in the *Alaska Service Investigation.*

In Order 70–3–110, issued March 23, 1970, the Board denied all four applications for exemption authority, doing so because they "raised difficult and complex questions including issues of carrier selection and mutual exclusivity" which "would be more appropriately decided after the development of a complete evidentiary record in the pending *Alaska Service Investigation.*" (J.A. 112.) The

Board also rejected a request for severance of the issues regarding service on the Anchorage-Kenai-Homer-Kodiak route, concluding that "no useful purpose would be served by instituting a separate investigation at this time." (J.A. 112, n. 3.)

Petitions for reconsideration of the Board's order were filed by Alaska and by Western and Wien jointly. Kodiak and Western Alaska filed a joint answer opposing these petitions, and Western filed an answer in opposition to Alaska's petition in which it stated that it would resume Kodiak-Seattle nonstop service. It did so, on a seasonal basis, on June 1, 1970.

In its order on reconsideration, Order 70–7–113, dated July 23, 1970, the Board approved Western's application for temporary suspension of services on the Anchorage-Kenai-Homer-Kodiak route segment,[4] granted Wien an exemption to provide service on this route until 90 days after final decision in the *Alaska Service Investigation,* and approved the agreement between the two dealing with the transfer of Wien's ground facilities and the disposition of its employees. The Board changed its mind with regard to the Western/Wien application "in the light of changed circumstances and various matters raised in the pleadings." (J.A. 161.) The only "changed circumstance" referred to specifically was Western's resumption of nonstop service between Seattle and Kodiak on a seasonal basis. The Board felt that "Alaska's exemption application was predicated on

---

1. Western also applied for a temporary suspension of services at King Salmon. Since Wien already provided services between Anchorage and King Salmon, it did not request a temporary exemption to serve this market.

2. Wien already owned and operated extensive terminal facilities at the Anchorage airport and there was thus no provision for transfer of facilities and equipment at this airport.

3. Alaska applied for temporary authority to operate between Anchorage and Seat-

tle via Kenai and Kodiak; Kodiak requested permission to operate between Anchorage and Kodiak via Kenai and Homer and between King Salmon and Seattle via Kodiak; and Western Alaska sought authority to provide Anchorage-King Salmon service and Anchorage-Seattle service via King Salmon, Kenai and Kodiak. (J.A. 109.)

4. The Board also granted Western's request for a temporary suspension at King Salmon. (*See* note 1, *supra.*)

Western's discontinuance of Kodiak-Seattle non-stop service" and that it would be "inappropriate" to grant Alaska's application in view of the fact that this condition no longer existed. (J.A. 162.) Of the three remaining applicants, the Board felt Wien was clearly the best qualified. The Board emphasized, however, that its selection of Wien for exemption authority would not affect its decision in the *Alaska Service Investigation* as to which carrier should be granted certification authority. (J.A. 162–63.)

Kodiak filed a motion for stay of the effectiveness of Order 70–7–113 with the Board and, before the Board rendered its decision, filed a similar motion with this court. Both motions were eventually denied. We did, however, grant Kodiak's motion for expedited consideration of its appeal.

Proceedings in the *Alaska Service Investigation* have continued while the parties contested the grant of exemption authority to Wien, but they are still not completed. Hearings ended on July 22, 1970, and the record was officially closed on August 5, 1970. The Hearing Examiner issued an initial decision awarding the route to Wien on March 26, 1971, but appeals from this decision are expected to consume several more months.

II. Kodiak's Interest in the Board's Order 70–7–113

■ Section 1006 of the Federal Aviation Act of 1958, 49 U.S.C. § 1486 (1964), reads in pertinent part:

(a) Any order, affirmative or negative, issued by the Board or Administrator under the Act * * * shall be subject to review by the courts of appeals of the United States or the United States Court of Appeals for the District of Columbia upon petition * * * by any person disclosing a substantial interest in such order.

Thus, to obtain review of the Board's Order 70–7–113, Kodiak must establish that it has a substantial interest in this order.

It is important at the outset to note the nature of the interest which Kodiak claims in these proceedings. Although Kodiak was itself an applicant for exemption authority, it does not rely on its competitive position in asserting that it has a "substantial interest" in the Board's order. In fact, it now contends that the statutory prerequisites for granting exemption authority were not and could not be met in these circumstances and that the grant of exemption authority to any carrier was therefore improper. Kodiak's claim of interest in these proceedings rests solely upon its argument that the allegedly improper grant of exemption authority will prevent it from receiving fair comparative consideration of its application for certification authority. Kodiak thus claims the requisite standing not as a disappointed contender for exemption authority, but as an applicant for certification authority.

Any claim of standing on this basis ultimately derives from Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). In that case the Federal Communications Commission had before it two mutually exclusive applications for licenses, and it granted one application without holding hearings while setting the other for hearing. The Supreme Court set aside the Commission's grant on the ground that the later hearing, though theoretically complying with the statutory mandate that all applicants for licenses be given an opportunity to be heard, was for all practical purposes "an empty thing." (*Id.* at 330, 66 S.Ct. 148.) The effect of the Court's decision was, of course, to require the Commission to hold competitive hearings regarding the two applications.

In *Ashbacker* the Court did not address itself specifically to the issue of the legality of grants of temporary authorization to operate pending decisions as to licensing or certification. It did, however, imply that such grants are

proper in some circumstances,[5] and this conclusion is compelled by the realities of the situation. "Comparative hearings are lengthy and detailed affairs * * *" and "the need for continuing already operating services, or establishing new ones, [may be] so great as to render it against the public interest to withhold authorization pending final outcome of the necessary hearings." Community Broadcasting Co. v. FCC, 107 U.S.App.D.C. 95, 100, 274 F.2d 753, 758 (1960).

Nonetheless, the spirit of *Ashbacker* requires that grants of temporary authority pending ultimate decision be closely scrutinized, for they are "pregnant with danger to truly comparative consideration." 107 U.S.App.D.C. at 100, 274 F.2d at 758. The "temporary" operator may have spent a large amount of money constructing and operating the necessary facilities, and the individuals passing on the applications for license or certification authority will undoubtedly realize that he may suffer substantial losses if he is not the successful applicant and is forced to sell "on a distress market." 107 U.S.App.D.C. at 100, 274 F.2d at 759. These individuals will also be aware of the "temporary" operator's "demonstrated past performance" (107 U.S.App.D.C. at 99, 274 F.2d at 758) and of the likelihood that earlier judgments have been made in his favor on issues the same as or similar to those involved in their decision. Springfield Airport Authority v. CAB, 109 U.S.App. D.C. 197, 285 F.2d 277 (1960). Try as they might, and undoubtedly will, the triers of fact may in some cases be unable to ignore the "temporary" operator's investment, his "track record," and/or the earlier determinations made pursuant to the grant of temporary authority. This "is not a challenge to [their] good faith or integrity * *, it is a recognition that they are mortal

men." Community Broadcasting Co. v. FCC, *supra*, 107 U.S.App.D.C. at 101, 274 F.2d at 759.

If in a particular case the dangers outlined above exist to such an extent that the grant of permanent authority might well be affected, an applicant for permanent authority must be allowed to challenge the grant of temporary authority. *See* Consolidated Nine, Inc. v. FCC, 131 U.S.App.D.C. 179, 403 F.2d 585 (1968); Beloit Broadcasters, Inc. v. FCC, 125 U.S.App.D.C. 29, 365 F.2d 962 (1966); Community Broadcasting Co. v. FCC, *supra*. In such a case review cannot be deferred until the final grant of authority has been made. The issues raised in these proceedings are usually very complex and technical, and it would be extremely difficult for us to determine, after the fact, whether the triers of fact had unconsciously favored the "temporary" operator because of his interim operations. Moreover, even if we were able to conclude that the decision regarding permanent authority had been subtly influenced, it would be virtually impossible for us to remedy the situation, for the actions giving rise to the prejudice would have been completed.

The Board cites a few cases which it believes stand for the proposition that the "dangers" we have discussed will not influence agency decisions and that it is therefore not necessary to review a grant of exemption authority at the behest of an applicant for certification. The Board seems to rely most heavily on Power Reactor Development Co. v. Int. Union of Electricians, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961), which overruled our decision entitled International Union of Elec., Radio, and Mach. Workers v. United States, 108 U.S.App. D.C. 97, 280 F.2d 645 (1960). In *Power Reactor* several labor unions, along with some of their members, challenged the Atomic Energy Commission's grant of

---

5. "The Supreme Court * * * carefully pointed out in *Ashbacker* that the Commission there did not *conditionally* grant the application, an inference at least that such a conditional grant pending hearing was proper in some circumstances. 326 U.S. at page 331, 66 S.Ct. at page 150." Community Broadcasting Co. v. FCC, 107 U.S.App.D.C. 95, 100, 274 F.2d 753, 758 (1960).

a conditional construction permit authorizing Power Reactor to construct a nuclear reactor for the generation of electric power. The labor unions and their members claimed that operation of the nuclear reactor would be unsafe, and that grant of the construction permit would quite likely lead to permission to operate. The crucial issue in the case, as stated by the Supreme Court, was "whether the Commission, in issuing a permit for the construction of a facility which will utilize nuclear materials, such as the power reactor presently involved, must make the same definitive finding of safety of operation as it admittedly will have to make before it licenses actual operation of the facility." 367 U.S. at 398, 81 S.Ct. at 1530. We felt that a definitive finding of safety was required at the time the construction permit was issued, but the Supreme Court disagreed. It held that a less stringent standard of safety was applicable at this preliminary point and that this standard had been met. In closing, the Court felt it necessary to respond to "the fears of nuclear disaster which respondents so urgently place before us." 367 U.S. at 414, 81 S.Ct. at 1538. It viewed the contention that these fears should be considered as "tantamount to an insistence that the Commission cannot be counted on, when the time comes to make a definitive safety finding, wholly to exclude the consideration that [Power Reactor] will have made an enormous investment." 367 U.S. at 414–415, 81 S.Ct. at 1538.

The Board contends that just as the Supreme Court presumed that the Atomic Energy Commission could ignore Power Reactor's large investment, so should we consider the Board capable of ignoring this and other factors which might on the surface appear to "endanger" its decision as to certification. We feel the circumstances in the two cases are quite different, however. Triers of fact might well be able to ignore factors such as the "temporary" operator's large investment in passing upon an issue of such importance as the safety of the operation of a nuclear reactor yet be unable to ignore these same factors in deciding which carrier is best suited for an airline route. Thus, in his dissenting opinion in *International Union*, Judge (now Chief Justice) Burger said that while he would "agree that there is a risk that large investment in machines might conceivably exert a subtle influence on the ultimate grant of an operations permit," he could not "join in the suggestion that members of the Atomic Energy Commission who have assumed obligations under oaths as binding as ours would permit an operation dangerous to the public because 40 or 50 million dollars is invested in brick, mortar and steel by men who knew from the outset they were engaged in a scientific gamble." 108 U.S.App.D.C. at 105, 280 F.2d at 653. We feel the Supreme Court would also draw this distinction, for in its opinion in *Power Reactor* it took care to point out the numerous steps and safeguards involved in the process of making a definitive finding as to the safety of a nuclear reactor, many of which do not appear in the normal administrative process.

It should also be noted that even if the Supreme Court had concluded that Power Reactor's investment might have affected the definitive finding as to safety, it would have been improper for the Court to have required that this definitive finding be made at the time the construction permit was granted. By requiring a less stringent safety finding at this time with the full knowledge that massive construction would ensue, Congress indicated that the necessity for beginning construction on a provisional basis outweighed any problems of prejudice to the later decision. If the Court had taken into account *Ashbacker* considerations in this case, it would thus have been ignoring a clear Congressional determination as to the paramount public interest involved.

The Board contends that we have the same kind of Congressional declaration here. Its position is simply that Congress authorized it to grant exemptions

and "Congress could not have been expected to have conferred this authority had it deemed the result to be prejudicial to certification proceedings. *Cf.* Power Reactor Co. v. Electricians, *supra.*" (Brief for Respondent at 20.) The flaw in the Board's reasoning is that operations conducted pursuant to a grant of exemption under section 416(b) often do not entail a massive investment,[6] whereas construction of a nuclear reactor obviously does. It is thus quite likely that Congress meant for the Board to consider the extent of the financial investment required and other similar factors in granting exemptions. Indeed, we find it somewhat artless of the Board to contend that Congress intended it to grant exemptions without regard for these factors because it *has* considered them in several cases. In fact, in this very case the Board indicated that Kodiak and Western Alaska were not proper candidates to operate the route on a temporary basis because to do so they would have to make a sizeable investment which they might later lose. (J.A. 164, n. 4.)

Having rejected the analogies which the Board attempts to draw from *Power Reactor,* we turn to the aspect of that case which seems to us most relevant for our present purposes—the disposition of the question of standing. Like Kodiak in the case before us, the unions and their members did not establish that they would suffer any harm prior to the award of an operating permit.[7] We nonetheless held that they had standing, and although the Supreme Court did not discuss the standing issue, it did reach the merits of the case. The implication is that the Court felt the decision as to the issuance of an operating permit might have been affected if there had

been defects in the earlier decision—if, for example, the Commission had not correctly applied the statutory criteria or had not made sufficient inquiry into the facts to make a reasoned decision. In this most important respect, then, *Power Reactor* seems to support our conclusion that review is required if it appears that occurrences related to the Board's grant of temporary authority may well affect the later certification proceedings.

The other cases which the Board cites as rejecting this conclusion—Peoples Broadcasting Co. v. United States, 93 U.S.App.D.C. 78, 209 F.2d 286 (1953) and Springfield Airport Authority v. CAB, *supra*—are also not persuasive on the point. The comments in these opinions which the Board relies upon were apparently directed at issues other than standing, which was neither discussed nor, so far as we can ascertain, determinative in either decision. In view of the circumstances, we do not believe these comments should be taken out of context. Moreover, even if these cases are to some extent inconsistent with our position that a carrier may in some cases have sufficient interest to challenge a grant of exemption authority by virtue of his status as an applicant for certification, we feel they have been superseded with regard to this issue by *Community Broadcasting, Beloit Broadcasters,* and *Consolidated Nine.*

The problem, then, is to determine when comparative consideration of applications for permanent authority might well be prejudiced by a grant of temporary authority. We have had occasion to consider this problem in earlier cases, particularly *Community Broadcasting* and *Consolidated Nine.*

---

6. Exemptions are required for such relatively minor operations as carrying "surface mail" (American Airlines v. CAB, 97 U.S.App.D.C. 324, 231 F.2d 483 (1956)), and stopping at cities which the carrier currently overflies. Pan American World Airways, Inc., Exemption (St. Lucia), CAB Order E–19680, June 13, 1963.

7. There was no claim that constructing the nuclear reactor facility would be unsafe, and we rejected appellant's contention that "[t]he fear of a possible atomic catastrophe" would cause property values to decrease even before operations were begun because this contention was not raised before the Commission. 108 U.S. App.D.C. at 99, 280 F.2d at 647.

In *Community Broadcasting* Modern Broadcasting Company and Community Broadcasting, Inc. filed applications for permission to construct and operate a VHF television station with the Federal Communications Commission. Modern also requested temporary authority to construct and operate the station pending completion of the hearings required to determine who should be licensed for regular operations, and this request was granted by the Board. Community Broadcasting had indicated in its application that it too would request temporary authority, but it had not done so at the time Modern's request for such authority was granted. In our opinion we discussed certain occurrences related to the grant of temporary authority which might well have influenced the later selection of the licensee. One of these was the substantial investment Modern was required to make to construct the station. Another was the fact that the Board had apparently ignored a serious question of concentration of mass communications media in making the grant. Our reasoning was that, having made a decision in favor of Modern without consideration of this crucial question, the Commission might later have been reluctant to deny Modern a license on this ground. The final occurrence influencing our decision was the Board's violation of rules and practices which it had formulated to ensure that temporary grants would not prejudice later hearings. We felt that the Board's deviation from its rules designed to deal with the problem of prejudice was enough to indicate that a serious *Ashbacker* problem existed in the case. In the words of Judge Burger, the author of the opinion:

> Section 1.362(b) of the Rules and the Commission's previously cautious characterization of that procedure warrant the conclusion that *a temporary grant is not only potentially prejudicial to the party or parties not* *favored but jeopardizes the whole scheme of full comparative consideration. It should be used only in circumstances which meet the Commission's own rules and its own warning that this is an "extraordinary" step.*

(107 U.S.App.D.C. at 103, 274 F.2d at 761) (Emphasis added.) Finding nothing in the Commission opinion indicating that extraordinary circumstances justifying its temporary grant were present, we reversed the Commission decision and remanded the case to it for "such inquiry as is needed to make comprehensive findings on all relevant factors." 107 U.S.App.D.C. at 105, 274 F.2d at 763.

The Federal Communication Commission's violation of its relevant rules and regulations was an even more decisive factor in *Consolidated Nine*. That case also involved applications for a license to operate a particular television station. One of the applicants was Mid-Florida Television Corporation, which had operated the station for eight years but which had never received a valid license to do so due to irregularities in the earlier licensing proceedings. There were several other applicants for the license, and most of these joined Consolidated Nine, Inc., which was formed for the purpose of applying for temporary authority and operating the station in the interim prior to award of the license. The Commission denied Consolidated Nine's application and awarded Mid-Florida temporary operating authority. As an applicant for temporary authority itself, Consolidated Nine clearly had standing to challenge the Commission's action. However, in his opinion reversing and remanding, Judge Burger indicated that the members of Consolidated Nine also had been denied their *Ashbacker* rights to fair comparative consideration of their license applications.[8] As an established,

---

8. Judge Burger obviously did so in recognition of the fact that in a very real sense it is the later decision as to licensing or certification which is at issue in these cases involving grants of temporary authority. Applicants for such authority are usually not interested in the financial rewards to be reaped from temporary

albeit unlicensed, station, Mid-Florida was not required to make any new investment, but Judge Burger emphasized that "[t]he absence of the preferential economic factor merely leads to the necessity to examine other factors to determine if the disposition in question has produced any prejudice to the *Ashbacker* rights of the parties." 131 U.S.App. D.C. at 188, 403 F.2d at 594. One of the two "other factors" we found to be present was the Commission's inconsistent application of a rule clearly designed to protect against problems of prejudice. Citing his opinion in *Community Broadcasting*, Judge Burger indicated that the question "whether the Commission has complied with its own rules" is essential to a determination of the existence of possible prejudice under *Ashbacker*. 131 U.S.App.D.C. at 189, 403 F.2d at 595.

Applying these precedents to the case before us, we reach the conclusion that Kodiak has alleged facts sufficient to indicate that it has a "substantial interest" in the Board's order granting exemptions to Western and Wien. To begin with Kodiak alleges that Wien will have to make a sizeable investment to operate the Anchorage-Kenai-Homer-Kodiak route on a temporary basis and will lose much of this investment if it is not granted certification authority. Kodiak also contends that the Board has deviated from policies and practices which it developed to avoid *Ashbacker* problems. Finally, Kodiak charges that the Board has not made sufficient inquiry into important issues which are critical both to the grant of temporary authority and to the later decision regarding certification. If it proves these allegations, Kodiak will have established that its *Ashbacker* right to fair comparative consideration of its application for certification authority has been prejudiced. It has thus alleged injury in fact resulting from the Board's grant of

exemption authority to Wien. Since Kodiak's interest certainly seems to be one which the statutory provision governing such grants, section 416(b) of the Aviation Act, 49 U.S.C. § 1386(b) (1964), was designed to protect, the two-part test of Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), has been met, and Kodiak has sufficient interest to challenge the Board's order.

### III. The Validity of the Board's Action

#### A. The Tests to be Applied

 Section 416(b) (1) of the Aviation Act reads as follows:

> The Board, from time to time and to the extent necessary, may (except as provided in paragraph (2) of this subsection) exempt from the requirements of this subchapter or any provision thereof, or any rule, regulation, term, condition, or limitation prescribed thereunder, any air carrier or class of air carriers, if it finds that the enforcement of this title or such provision, or such rule, regulation, term, condition, or limitation is or would be an undue burden on such air carrier or class of air carriers by reason of the limited extent of, or unusual circumstances affecting, the operations of such air carrier or class of air carriers and is not in the public interest.

The requirements of this section were set forth with somewhat more clarity than appears in the statute in the following language from Pan American World Airways, Inc. v. CAB, 104 U.S.App.D.C. 288, 290–291, 261 F.2d 754, 756–757 (1964):

> Section 416(b) of the Act permits the Board to exempt an air carrier from the certificate requirements of § 401 if, but only if it first finds that en-

---

operations; in fact, they often know full well that they will incur losses if they are successful. Their primary concern thus seems to be in preventing a competi-

tor from gaining any preference in the later proceedings by virtue of his temporary operations.

forcement of those requirements would have certain specified results because of the existence of certain specified conditions. The Board must find that the 'operations' of the air carrier seeking exemption are either (1) of 'limited extent' or (2) affected by 'unusual circumstances.' Aside from finding that one of these conditions is present, the Board must also find that that condition *causes* enforcement of the certificate requirements to work 'an undue burden' on the carrier. Finally, the Board must find that enforcement of the requirements 'is not in the public interest.' In the absence of any one of these findings the Board is not authorized to suspend the normal statutory requirements of notice, hearing, and requisite findings for issuance of a certificate of public convenience and necessity.

(Footnotes omitted.)

B. The "Public Interest"

We turn, then, to the difficult task of determining whether the Board complied with the requirements of section 416(b)(1) in making the grants to Wien and Western. Because many of the critical issues in this case are involved in the question whether the Board has established that its grant of exemption authority to Wien was in the public interest, we begin with an examination of this question.

The primary benefit to the public which might result from a grant of exemption authority would, of course, be in additional or improved air service. However, such a grant is not necessarily in the public interest merely because it would bring about a marginal increase in the quantity or quality of air service. It must also be shown that the improved service outweighs any detrimental effects resulting from the grant. In this case Kodiak alleges that the grant of exemption authority and Wien's operations conducted pursuant thereto will detrimentally affect the later certification proceedings. This element of possible prejudice under *Ashbacker* is clearly a major factor to be considered in determining the public interest. As Judge Burger said in *Consolidated Nine:*

> We emphasize that in referring to the "public interest" we do not limit this to the creation or maintenance of a broadcast facility; the public has a far greater interest in the fairness of the licensing process than in simply adding—or keeping—one more broadcast facility on the air.

(131 U.S.App.D.C. at 190, 403 F.2d at 595.) The Board has recognized the paramount public interest involved in maintaining the fairness and objectivity of its certification procedures by refusing to grant exemption authority where its later decision regarding certification might be affected by the grant. Central Airlines, Abilene Exemption, 33 C.A.B. 1048 (1961); West Coast Certificate Renewal Case, 15 C.A.B. 349 (1952). In fact, in the case before us the Board originally concluded that it would be best to deny all applications for exemption authority in view of the pending proceedings regarding certification.

The question presented, then, is whether the Board's findings in its Orders 70–1–113 and 70–8–34 [9] indicate that it adequately considered the possibility of prejudice under *Ashbacker* and concluded that this possibility was out-

---

9. Order 70–8–34 is the Board's order denying a stay of the effectiveness of Order 70–7–113. Kodiak claims that we should not consider the findings contained in this order because the Board did not have jurisdiction at the time it issued the order to reconsider its award of exemptions, Kodiak having filed a petition for review with this court. (Brief for Petitioner at 10–11; Reply Brief for Petitioner at 4–7.) In support of its claim, Ko-

diak quotes the following language from section 1006(d) of the Aviation Act, 49 U.S.C. § 1486(d) (1964):

> Upon transmittal of the petition to the Board or Administrator, the court shall have *exclusive* jurisdiction to affirm, modify, or set aside the order complained of * * *.

(Emphasis added.) In view of the disposition we make of this case, it is unnecessary for us to decide this question.

weighed by the improved service which Wien would allegedly provide. *See* Beloit Broadcasters, Inc. v. FCC, *supra*, 125 U.S.App.D.C. at 30, 365 F.2d at 963. Because the Board has changed its mind about the propriety of the grant to Wien and may thus have indicated some doubts in its own mind as to the proper balance to be struck here, we must scrutinize its findings with particular care. *See* Frontier Airlines, Inc. v. CAB, 142 U.S. App.D.C. 124, 439 F.2d 634, 637 (1971).

The Board obviously thought the possibility of prejudice in this case was not great. It indicated that Wien would not be required to make a substantial investment to operate the Kodiak-Homer-Kenai-Anchorage route segment on a temporary basis and it emphasized that it would not consider operations conducted pursuant to the grant of exemption authority in ruling upon the applications for certification. Believing these statements were sufficient to show that granting Wien exemption authority would have no detrimental effect on the later decision as to certification, the Board moved to a consideration of the benefits to be derived from such a grant. It found that Wien would be able to provide more flights than Western with aircraft better suited for the route.[10] It also concluded that granting the exemption would remove Western from an unprofitable operation while allowing Wien to make a profit on the same operation and thereby reduce its need for federal subsidy. Finally, the Board noted that permitting Wien to operate the route would "provide the public with single-carrier service between Kenai, Homer, and Kodiak, on the one hand, and points north of Anchorage on Wien's existing system, such as Fairbanks and Prudhoe Bay, on the other hand." (J.A. 195.) On the basis of these findings, the Board concluded that granting a suspension to Western and an exemption to Wien would be in the public interest.

Kodiak attacks this conclusion on several grounds. It first argues that the Board's finding that Wien would not have to spend substantial amounts to operate the route in question on a temporary basis was incorrect. We find this argument to be without merit, however. Wien had planes on hand which it could use on the route and its agreement with Western obviated the need to purchase ground facilities outright. Wien may have some difficulties disposing of employees if it is not successful in the certification proceedings, but these difficulties are not sufficient in themselves to suggest that the decision as to certification will be influenced by the grant of temporary authority.

Kodiak's primary contention is that the Board did not follow policies which it developed to deal with *Ashbacker* problems and that its balancing of the public interest considerations is defective for this reason. Kodiak argues that prior Board decisions dealing with applications for exemption authority pending proceedings as to certification indicate a firm policy that such authority is to be granted only where extraordinary circumstances exist. There is support for this contention in the Board's opinions and orders. In Pan American World Airways, Inc., Exemption, Order E–19680, June 13, 1963, the Board said:

> Route authority will not be granted by exemption in cases where there is pending before the Board a comprehensive investigation involving substantially the same issues, except upon a clear showing of such unusual, compelling or emergency circumstances as would justify a departure.

(*Id.* at 3.) Since section 416(b) (1) requires a finding of unusual circumstances prior to the grant of any exemption, it could be argued, and is by intervenors Wien and Western, that the above quote is just a restatement of a portion of this section. However, the Board's spe-

---

10. The Board also noted that some of these aircraft would be jets, the first to be used on the route.

cific reference in the quote to exemption authority granted pending certification proceedings and its emphatic statement that "such unusual, compelling or emergency circumstances" must be shown certainly suggest that the Board meant to require circumstances more unusual than is normally necessary to support a grant. Language in other cases also supports this interpretation.[11]

Moreover, the Board seems to have applied this rule in disposing of several cases involving applications for exemption authority. It has refused to grant exemption authority in at least two cases because of the pendency of certification proceedings involving the route in question. In the *West Coast Certification Renewal Case, supra,* United Airlines and West Coast Airlines had filed applications for certification authority which were to "go to hearing at an early date," and in these circumstances the Board thought "it would be improper to grant United's application under Docket 4995 seeking an exemption *pendente lite* * * * and thereby *place that airline in a preferential position.*" (15 C.A.B. at 351) (Emphasis added.) In *Central Airline, Abilene Exemption, supra,* the Board denied a request for exemption authority in circumstances quite similar to our own. There the Board said:

> After careful consideration we have decided to deny the exemption applications. The applications raise complex and controversial issues of law and fact which should be decided in a formal case. This is particularly indicated where these issues are currently being litigated in a formal proceeding. Thus, in the pending *Southwestern Area Local Service Case,* Docket 1018, Central and Trans-Texas prosecuted competing applications to serve Abilene. * * * Grant of the exemption

authority here requested *would tend to prejudge these Southwestern Area Case issues.*

(33 C.A.B. at 1048) (Emphasis added.) In another case the Board granted an application for exemption authority on reconsideration, but it emphasized that it did so only because of the "urgent" need for airplane service. Transportation Corporation of America d/b/a Trans Caribbean Airways, Inc., CAB Order E–14850 (January 19, 1960).

There are some cases which do not appear consistent with what Kodiak alleges is the Board's practice in granting exemption authority pending a decision as to certification, but Kodiak believes that many of these cases can be explained by reference to the limited nature of the authority granted therein and the operations of the carrier receiving the grant. In more precise terms, it carves out an exception for decisions in which the Board lifted restrictions on the certificate authority of carriers already serving the market in question, restrictions such as those prohibiting turn-around service or nonstop service. It quotes the following language from Mackey Airlines, Inc., Exemption, CAB Order E–21629, December 30, 1964 as giving the rationale for such grants:

> Here, we are not placing Mackey in a market in which it now has no identity and is not providing service. Rather, Mackey is now an effective competitor between Miami and Nassau. The grant of this application should permit an improvement in the service rendered and should not give Mackey any advantage in the route proceeding it does not already have due to its established position.

(*Id.* at 5.) In *Mackey* the Board expressly stated that this reasoning warranted a departure from its usual rule

---

11. Mackey Airlines, Inc., Exemption, CAB Order E–21629, Dec. 30, 1964, indicates that the Board has used the term "unusual circumstances" to mean different things. In its opinion in this case the Board at one point gave reasons why it would not have to adhere to its rule that

grants of exemption authority pending certification proceedings were to be made only where "unusual circumstances" were present. (*Id.* at 5.) A few lines later, however, the Board stated that the statutory requirement of "unusual circumstances" had been met. (*Id.*)

of denying "exemption applications for route authority which is in issue in a pending certificate proceeding." (*Id.*) Since the *Mackey* exception is not applicable to the present case, Wien being given temporary authority to serve a relatively important Alaskan air route which it did not formerly serve, Kodiak claims that the grant to Wien is inconsistent with the Board's former policy. It further contends that, having deviated from its earlier precedents, the Board was required to explain its deviation under Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. 9, 420 F.2d 577 (1969),[12] that it did not do so, and that its decision must therefore be overturned.[13]

The Board's response to Kodiak's arguments is simply that it did not deviate from its past policies and practices in this case. Rather than applying an inflexible test to all applications for exemption authority, the Board has, so it says, decided the cases on an individual basis, relying on such "determinative factors" as the complexity of the issues involved and the impact which the "temporary" operator's services would have on other carriers. It also contends that it has not required that an emergency or compelling need for service exist, but has granted exemptions where the public would receive "better and more convenient services, even though other adequate service is available." (Brief for Re-

spondent at 37.) Not surprisingly, the Board interprets its decisions in the *West Coast Certificate Renewal Case* and *Central Airlines, Abilene Exemption* somewhat differently than Kodiak. It says that it did not refuse to grant exemption authority in these cases *merely* because of the pendency of certification proceedings, but that it refused because there were difficult questions raised as to which carrier should be given exemption authority, questions which could best be answered after completion of the pending proceedings. In support of its interpretation, the Board quotes its finding in *Central Airlines* that "[t]he applications raise complex and controversial issues of law and fact which should be decided in a formal case." 33 C.A.B. at 1048.

The Board asserts that its award of an exemption to Wien was in complete accord with these earlier cases. It says that it was impossible to decide without hearings whether Alaska or Wien was the best qualified to serve the route, but that once Alaska had been effectively removed as an applicant for exemption authority by virtue of Western's resumption of Seattle-Kodiak flights, there were no "complex and controversial issues" remaining in the case and the grant of exemption authority to Wien was proper. According to the Board, then, it did not depart from its past practices and policies in the least and

12. In *Marine Space Enclosures* we said:
 An agency may modify or even reverse its past policies * * * but the confidence of a reviewing court that these adjustments are made in accordance with the requirements of law is not enhanced when the prior precedents are not discussed, the swerves and reversals are not identified, and the entire matter is brushed off once over lightly.
 137 U.S.App.D.C. at 17, 420 F.2d at 585. *See also* FTC v. Crowther, 139 U.S.App.D.C. 137, 141, 430 F.2d 510, 514 (1970).

13. The Board contends that we should not consider Kodiak's arguments that it departed from a past policy of requiring emergency circumstances before granting exemption authority pending certifica-

tion proceedings and did not sufficiently explain this departure. According to the Board, these arguments were not made below and thus cannot be raised on this appeal. (Brief for Respondent at 36.) We think this contention is witout merit. In its motion for a stay Kodiak made the following statement, and the emphasis is Kodiak's:
 *No findings by the Board in its Order 70–7–113 establish the extreme public urgency which would be required to justify the Board's approval of Western's and Wien's ex parte determination of some of the most important issues in that proceeding.*
 (J.A. 177.) Later in its motion Kodiak noted that "the Board does not cite a single precedent in its Order 70–7–113 for the action it has taken." (J.A. 179.)

there was thus no need for it to engage in the discussion necessary to explain and justify such a departure.

After considerable deliberation we have concluded that the Board departed to some extent from its past policies in making the grants to Western and Wien and did not provide sufficient explanation of this departure. Our difficulty in deciding this question derives in large part from the apparent inconsistencies in the Board's opinions. Although there are cases which are difficult to reconcile with Kodiak's explanation of the Board's policy, the Board has expressed and apparently applied this policy in several cases. In the *Central Airlines* and *West Coast Certificate* cases, for example, the language of the opinions seems, on balance, to support Kodiak's position. The Board's rationalization of these cases is insufficient to explain the comment in *Central Airlines* that awarding the exemption would "place that airline in a preferential position" (15 C.A.B. at 351) or the statement in *West Coast Certificate* that "[g]rant of the exemption authority here requested would tend to prejudge these Southwestern Area Case issues." 33 C.A.B. at 1048. These remarks seem to indicate that, independent of the question whether there were complex issues involved in the case, the Board was concerned about the effect of the grant of exemption authority on the pending decision as to certification. *Mackey, Trans Caribbean,*

and other cases also support this interpretation.

Another consideration affecting our decision is that we are not convinced of the wisdom of the course which the Board apparently followed in this case. When there are difficult questions raised by applications for exemption authority it is unquestionably proper to refuse to grant any of these applications in order to defer judgment on these questions until after the proceedings on certification have been completed. In fact, in some cases this is, as a practical matter, required.[14] It does not follow from this, however, that the Board *should* grant exemption authority when there are no close questions to be resolved in later proceedings and there will be only a marginal improvement in service to the public. Many of the dangers inherent in such grants still exist; the "temporary" operator has the opportunity to make a favorable record, and there have been judgments made in his favor. That these judgments did not involve close questions does not necessarily mean they will not influence the later grant of authority. The Board's determination that an applicant's request for exemption authority was essentially frivolous may actually be more prejudicial to him than its deciding against him on a close question.[15] In our opinion in *Community Broadcasting,* in which we discussed factors similar to those involved in this case, we set forth our view that grants

14. In *Community Broadcasting* we remanded the case to the Board for "such inquiry as is needed to make comprehensive findings on all relevant factors." 107 U.S.App.D.C. at 105, 274 F.2d at 763. Where quite complex questions are presented, the inquiry required would probably include hearings. While hearings could be held on the grant of temporary authority, it would ordinarily be much more practical merely to expedite the hearings scheduled with regard to licensing or certification. In this regard we note that Board Member Minetti, who dissented from Orders 70–7–113 and 70–8–34, thought "the preferable course would be to direct the examiner to issue a separate initial decision in [the *Alaska*

*Service Investigation*] with a view to early final decision by the Board." (J.A. 169.)

15. At one point in Order 70–8–34, the Board seemed to imply that it fully expected Wien to be granted certification authority. The statement we refer to is as follows:

The pendency of this complex proceeding also constitutes an undue burden on Wien to require it to await the outcome of that complex proceeding to inaugurate service on routes which Wien is prepared to serve on a temporary basis, pending a final resolution of the *Investigation.*

(J.A. 196.)

of temporary authority should ordinarily be made only when the need for interim services is great. In the absence of clear indications in the Board's orders and opinions that it has followed a different policy and persuasive reasons as to why it has done so, we are reluctant to conclude that its policy has not in fact been similar to that we stated with approval in *Community Broadcasting*.

Finally, even if we were to conclude that the Board is correct in its statement of its past policy, we would nevertheless have some reservations about its action here because of the questionable circumstance which, in the Board's opinion, brought that policy into play. As we discussed earlier, the Board decided to temporarily suspend Western and temporarily exempt Wien in view of Western's resumption of Seattle-Kodiak flights, feeling this removed Alaska as a viable candidate for exemption authority. It thus granted a suspension to a party because of a "changed circumstance" brought about by that very party, and this troubles us. We do not mean to suggest or imply in any way that Western "engineered" the grants in question. We do feel, however, that the Board's willingness to allow Western's resumption of flights to affect its decision sets a questionable precedent at best, and we feel that the Board's orders should indicate that this troublesome problem was considered, which they do not.

In summary, then, we conclude that the Board did not give an adequate explanation of its past policy and did not make "comprehensive findings" regarding its application of that policy in this case.[16] *See Community Broadcasting, supra,* 107 U.S.App.D.C. at 105, 274 F.2d at 763; *see also American Airlines, Inc. v. CAB,* 98 U.S.App.D.C. 348, 355, 235 F. 2d 845, 852 (1956). In view of these defects, we would be authorized to uphold the Board's ultimate conclusion that the grants were in the public interest only

if it were clear that there was an immediate or compelling need for Wien's services. This is by no means clear, however. Western was serving the Kodiak, Homer, Kenai, and Anchorage markets, and its service was adequate. The improvements in quality and quantity of service which the Board found that Wien would provide do not appear to be great; at one point the Board indicated that Wien's service would be "as good or better than that provided by Western." (J. A. 165.)

A strong case can in fact be made for the proposition that the Board's findings regarding the benefits to be derived from making the grants are also defective in that they do not provide us an adequate basis for reviewing its decision. *See, e. g.,* American Airlines, Inc. v. CAB, *supra,* 98 U.S.App.D.C. at 356, 235 F.2d at 853. Other than noting that Wien would use planes with lower operating costs, the Board gave no reason why it felt Wien would derive a profit from the same route which had apparently been quite unprofitable to Western, and there were indications that some of the revenues forecast for Wien in the Western/Wien application would not be forthcoming. Wien's profit estimates were based on the assumption that Western would not operate nonstop Kodiak to Seattle flights and that people traveling between these two cities would therefore be forced to use the Kodiak-Homer-Kenai-Anchorage route. *See* J.A. 35, 39. With Western's resumption of nonstop Kodiak-Seattle flights on a seasonal basis, it is questionable whether Wien could continue to expect substantial revenues from travelers between Kodiak and Seattle during the "peak" season. The Board did not discuss the effect of Western's resumption of Kodiak-Seattle flights on Wien's expected revenues, an omission which is quite anomalous in view of its heavy reliance on the resumption of these flights in deciding to grant the exemption at issue here.

16. Section 1005(f) of the Aviation Act requires that "every order of * * * the Board shall set forth the findings of fact upon which it is based * * *." 49 U.S.C. § 1485(f) (1964).

The issue of Wien's profits was related to other public interest considerations. If it did not make a profit from its temporary operations, Wien obviously would not be able to reduce its need for federal subsidy. Moreover, Wien's scheduling proposals were undoubtedly tied to its estimated revenues, and if these revenues failed to materialize, its flight schedule might well be adjusted downward.[17] Perhaps the question of the profits which Wien could expect to derive from the Kodiak-Homer-Kenai-Anchorage route and the services which it could be expected to provide in view of these profits are so complex and controversial that they should have been deferred pending a decision as to certification. At the very least we feel the Board should also have made more "comprehensive findings" with regard to these issues.

C. "Unusual Circumstances" and "Undue Burden"

The other requirements of section 416 (b) (1) are that enforcement of the certification requirements on the carrier would be "an undue burden on such air carrier * * * by reason of the * * unusual circumstances affecting, the operations of such air carrier."

The Board's opinions and orders are of little help in determining what constitutes unusual circumstances. When it grants a carrier temporary authority, the Board's normal practice is simply to include in its decision a statement to the effect that unusual circumstances exist; it makes no attempt to explain what these circumstances are. The only significant variation from this pattern seems to occur when a disappointed party challenges a grant of exemption authority and the Board issues an opinion on reconsideration. See American Airlines, Exemption, CAB Order E–26394, Feb. 23, 1968.

The present case presents a perfect example of this practice. In its Order 70–7–113 the Board made no mention of unusual circumstances. In its order on reconsideration, however, the Board explained that the unusual circumstances present were the "downturn in Alaska's economic growth, which left Wien with excess jet aircraft which the carrier had ordered in anticipation of an oil boom which failed to materialize," and the pendency of the complex *Alaska Service Investigation,* which caused a delay in certification. (J.A. 196.)

We feel there are defects in these findings regarding unusual circumstances which, although perhaps not of decisional significance in themselves, are sufficient to require a clearer statement from the Board on remand. To begin with, we feel the Board should, in general, pay more attention to this statutory requirement than it apparently has. It is required to indicate the facts or findings which cause it to conclude that un-

---

17. This eventuality may already have come to pass. Kodiak cites figures which indicate that the number of flights "provided by Wien is in every case less than what it offered to provide, and in half of the markets it is actually providing a lesser frequency of service than was previously offered by Western Airlines." (Reply Brief for Petitioner at 8.) The figures appear below:

COMPARATIVE DAILY FREQUENCY OF
ROUNDTRIP FLIGHTS

| | Western | Wien Proposed | Wien Actual |
|---|---|---|---|
| Kodiak—Homer | 2 | 2 | 1 |
| Kenai | 2 | 2 | 0 |
| Anchorage | 2 | 3 | 2 |
| Homer—Kenai | 2 | 2 | 1 |
| Anchorage | 2 | 3 | 2 |
| Kenai—Anchorage | 3 | 6 | 3½ |

Source: Official Airline Guide, North American Edition, November 15, 1970 and J.A. 28–29.

(*Id.*)

usual circumstances exist (*see* American Airlines, Inc. v. CAB, *supra*, 98 U.S.App. D.C. at 354–355, 235 F.2d 851–852), and its failure to do this in the past and in its Order 70–7–113 leaves us in doubt as to whether the Board adequately considered this requirement here.

We also feel the Board erred in considering the pendency of complex proceedings on certification an unusual circumstance and the resulting delay in certification an undue burden to Wien. The Board quotes some language from American Airlines, Inc. v. CAB, *supra*, in support of its position on this issue,[18] but we feel this language was meant to pertain only to that case, in which time was a vital factor, and was not intended to express a general rule. The requirements of unusual circumstances and undue burden would be all but meaningless if the mere fact that certification proceedings were pending were enough to satisfy them.

The only remaining circumstances which the Board cited as unusual were the downturn in the Alaskan economy and its effect upon Wien's operations. On remand the Board should state clearly whether it feels these circumstances are sufficient in themselves to satisfy the statutory requirement.

With regard to undue burden, the Board found that refusing to grant Wien exemption authority would prevent it from earning profits through temporary operations on the Kodiak-Homer-Kenai-Anchorage route and would also prevent it from utilizing to the fullest extent possible the jet planes which it acquired in anticipation of an oil boom. The Board then concluded that these factors were sufficient to satisfy the statutory requirement, and there is support for this conclusion in its prior decisions. In several cases it has held that requiring compliance with the certification proceedings of section 401 would be an undue burden to a carrier where a grant of exemption authority would result in economic benefit to the carrier and increased efficiency in that carrier's utilization of its planes and other equipment. Central Airlines Exemption, 26 C.A.B. 760 (1968); American Airlines, Exemption, C.A.B. Order E–25903, Oct. 31, 1967; Transportation Corporation of America d/b/a Trans Caribbean Airways, Inc., C.A.B. Order E–14850, Jan. 19, 1960; *but see* Chicago and Southern Airlines, Inc., Hot Springs Exemption, 7 C.A.B. 451 (1946). However, as we discussed earlier, there is some question as to whether Wien will derive a meaningful profit from the operations at issue here, and the Board must set forth a more detailed explanation of its reasoning on this point.[19]

---

18. The language on which the Board relies is the following:

> If the Board had rested a finding of undue burden upon the fact that the interim for which this operating authority is issued is short, whereas the remainder of a certification proceeding would be long, we would be close to the ruling of this court in [an earlier case affirming a grant of exemption authority.] But we do not understand the Board to rest upon the temporary feature of the order. The purport of the discussion in the opinion of the Board is that the exemption power may be exercised to accomplish the permanent ends it has in mind for these supplemental carriers and does not depend upon or resolve about the temporary character of the exemption presently authorized.

98 U.S.App.D.C. at 355, 235 F.2d at 852.

19. The Board should perhaps also provide some explanation as to why it changed its mind on the issue of undue burden. In its Order 70–3–110 denying all applications for exemption authority the Board was "unable to find that enforcement of the Act would be an undue burden on the applicants" (J.A. 112), and there is no indication in its later orders how Western's resumption of Kodiak-Seattle flights or any other changed circumstance or new evidence affected this finding. Moreover, with regard to one factor which the Board considered, albeit improperly—the delay in certification proceedings—a finding of undue burden would have been more appropriate at the time of the earlier order. Unexplained reversals of position such as this do not inspire confidence in the Board's decision-making process.

358

## IV. Disposition of the Case

Because of the inadequacy of the Board's findings, its Order 70–7–113 must be vacated and the case remanded to the Board for further proceedings. The Board may, at its discretion, continue Wien in operation pending its final decision as to certification. We have been advised that this decision will be forthcoming in a matter of months, and the Board should proceed "with all deliberate speed" to surpass this timetable if at all possible. *See, e. g.*, Greensboro-High Point Airport Authority v. CAB, 97 U.S.App.D.C. 358, 363, 231 F.2d 517, 522 (1956).

At first glance it might appear that we are undermining the principles enunciated in our decision by allowing the Board to continue Wien in operation, but we do not believe this to be the case. We are confronted with markedly different circumstances than those existing at the time the Board made its grant of exemption authority. If we do not allow Wien to continue serving the markets in question here, these markets will in all probability be without regularly scheduled air service until the grant of certification authority is made. Western could resume operations, but this does not seem feasible since it is very likely another carrier will be certified for the route a few months hence. Another consideration affecting our decision on this issue is that most of the occurrences incidental to the grant of temporary authority which might influence the later decision as to certification have already transpired. Extending Wien's authority to operate the route for a few more months will not add any element of *Ashbacker* prejudice not already present in the case.

The question might then be asked whether a remand at this time for further findings serves any useful purpose. We feel it does. If the findings made by the Board on remand are satisfactory, the question of prejudice under *Ashbacker* will be closed and the Board will have set forth sorely needed standards for courts and carriers involved in fu-

ture cases. If they are not, or if the Board concludes that it erred in temporarily suspending Western and temporarily exempting Wien, we will have further guidelines to aid us in the difficult task of determining whether the grant of exemption authority did in fact affect the decision as to certification, should this later decision be appealed to us. Our remand here may in fact obviate the need to review the decision regarding certification, for it will undoubtedly inspire the Board to be extremely careful in making this decision. There are thus sound practical reasons for remanding this case to the Commission, and we do so.

Reversed and remanded for further proceedings consistent with this opinion.